**BATTENFELD OF AMERICA HOLDING COMPANY, INC., SMS Capital Corp. and SMS Finance Corp., Plaintiffs,**

v.

**BAIRD, KURTZ & DOBSON, Defendant/Third–Party Plaintiff,**

v.

**Friedrich Theysohn GmbH et al., Third–Party Defendants.**

**No. 97–2336–JWL.**

United States District Court, D. Kansas.

July 13, 1999.

Randall E. Hendricks, Phillip G. Greenfield, Scott M. Brinkman, Vivian W. McLeod, Rouse, Hendricks, German, May & Shank, Kansas City, MO, for Battenfeld of America Holding Company, Inc., SMS Capital Corporation, SMS Finance Corporation plaintiffs.

James A. Snyder, Lathrop & Gage L.C., Overland Park, KS, John R Gerstein, Ross, Dixon & Masback, Washington, DC, Timothy K. McNamara, James A. Snyder, Daniel L. McClain, L.J. Buckner, Jr., Lathrop & Gage L.C., Kansas City, MO, for Baird Kurtz & Dobson defendants.

## MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

Plaintiffs Battenfeld of America Holding Company, Inc. ("Battenfeld"), SMS Capital Corporation and SMS Finance Corporation (collectively "SMS") filed this negligence action against defendant accounting firm Baird, Kurtz & Dobson ("BKD") arising out of accounting and auditing services BKD provided to American Maplan Corporation ("AMC"), a corporation purchased by Battenfeld/SMS in 1995.

This matter is presently before the court on several motions for summary judgment: Defendant BKD's motion for summary judgment based on K.S.A. § 1–402 (doc. # 384); defendant BKD's motion for summary judgment against Battenfeld/SMS and on Counts III–V of third-party defendant AMC's amended counterclaim (doc. # 388); Battenfeld/SMS and AMC's motion for summary judgment on BKD's comparative fault designations (doc.

# 400); AMC's motion for summary judgment on BKD's fourth amended third-party complaint (doc. # 404); third-party defendant VGT AG's motion for summary judgment (doc. # 393); third-party defendant Friedrich Theysohn GmbH's motion for summary judgment (doc. # 395); third-party defendant Reinhard Theysohn's motion for summary judgment (doc. # 398); third-party defendant Ernst Kruger's motion for summary judgment (doc. # 383); and third-party defendant Horst Eigruber's motion for summary judgment (doc. # 406).

As set forth in more detail below, BKD's motion for summary judgment based on K.S.A. § 1–402 is granted in part and denied in part. Specifically, the motion is granted with respect to SMS Finance Corporation and denied with respect to plaintiff Battenfeld and plaintiff SMS Capital Corporation. Accordingly, the claims of SMS Finance Corporation are dismissed. BKD's motion for summary judgment against Battenfeld and on Counts III–V of AMC's amended counterclaim is granted in part and deferred in part. Specifically, the motion is granted with respect to Battenfeld's breach of contract claim and Counts III–V of AMC's amended counterclaim. These claims are dismissed. The court defers ruling on the motion to the extent it raises evidentiary issues (*i.e.*, whether Battenfeld's evidence with respect to its alleged damages is competent) that will be addressed in connection with the *Kumho* hearing scheduled later this month. Battenfeld/SMS and AMC's motion for summary judgment on BKD's comparative fault designations is granted in its entirety and, accordingly, BKD's comparative fault designations are dismissed. AMC's motion for summary judgment on BKD's fourth amended third-party complaint is granted in its entirety and BKD's third-party complaint is dismissed as to third-party defendant AMC. Third-party defendant VGT AG's motion for summary judgment and third-party defen-

dant Friedrich Theysohn GmbH's motion for summary judgment are granted in part and denied in part. The motions are granted with respect to BKD's negligent misrepresentation claims, granted to the extent that BKD is attempting to assert an independent, substantive claim for "indemnity," and are otherwise denied. The motions of third-party defendants Reinhard Theysohn, Ernst Kruger and Horst Eigruber are granted in part and denied in part. The motions are granted with respect to BKD's comparative fault designations and are otherwise denied.

## I. Facts [1]

### A. Background

The dispute among the parties in this case centers around Battenfeld's purchase of American Maplan Corporation ("AMC"), a Kansas corporation located in McPherson, Kansas. Prior to Battenfeld's purchase of AMC in 1995, AMC was wholly owned by third-party defendant Friedrich Theysohn GmbH ("FTG"). FTG, in turn, was and remains wholly owned by VGT AG ("VGT").

BKD was retained by AMC to perform various audits of financial statements and accounting services at a time when individuals at AMC were making false entries in AMC's books and accounting records, resulting in a material overstatement of assets, equity and earnings and a material understatement of liabilities. Battenfeld alleges that it relied on the results of a special acquisition audit conducted by BKD in deciding to purchase AMC and in establishing the purchase price, and that BKD's audit report falsely represented AMC's financial standing. Battenfeld further alleges that BKD negligently failed to discover, failed to investigate and/or failed to report pertinent financial data about AMC.

---

1. For convenience and clarity, additional uncontroverted facts will be provided as they relate to the respective motions.

BKD, in turn, claims that the third-party defendants engaged in an elaborate fraudulent accounting scheme to artificially inflate the profitability and value of AMC by creating various fictitious accounts receivable and inventory on AMC's books. According to BKD, VGT devised the fraudulent scheme to improve VGT's consolidated financial statements because VGT was experiencing financial difficulties. BKD further alleges that the scheme was facilitated by a number of directors and officers common to VGT, FTG, and AMC.

### B. The Theysohn Entities and Corporate Officers

As set forth above, prior to Battenfeld's purchase of AMC in 1995, AMC was a wholly-owned subsidiary of Friedrich Theysohn GmbH ("FTG"). FTG also owned other subsidiaries, including Theysohn Extrusions Technik ("TET") and Theysohn Maschinenbau ("TMB"). Reinhard Theysohn, who had an ownership interest in FTG, served as a managing director of FTG and also served in various management capacities at FTG's subsidiaries. In the early 1990s, another company, VGT AG, purchased FTG and its subsidiaries, including AMC, TET and TMB. At that time, Reinhard Theysohn began serving as a member of VGT's three-member board of management and continued serving in various management positions of FTG, AMC, TET and TMB. Specifically, Mr. Theysohn served as a managing director of FTG, TET and TMB, and served as the president, CEO and chairman of the board of AMC.

VGT produces and sells two main products—plastics (plastic parts and plastic machinery) and ceramic material. The Theysohn companies (AMC, TET and TMB) constituted the plastics machinery division of VGT. AMC sold product to the North American and South American markets, TET sold product to the European and Asian markets, and the two companies also sold product to each other. TMB, on the other hand, supplied screws and barrels to AMC and TET. In addition, TMB sold a particular machine, the compounder, throughout the world. The record reflects that the financial statements of AMC, TET and TMB were consolidated.

In 1993, VGT's board of management decided to place AMC, TET and TMB under the same management. In that vein, VGT's board promoted Dr. Ernst Kruger, previously Reinhard Theysohn's personal assistant and an employee of TMB, to serve as a managing director of TET and TMB and to serve as a senior vice president and board member of AMC. At the same time, VGT's board selected Horst Eigruber, AMC's chief operating officer, to serve as a managing director of TET and TMB. Together, Dr. Kruger and Mr. Eigruber shared the management responsibility for AMC, TET and TMB. Dr. Kruger was primarily responsible for the day-to-day operations of TMB, Mr. Eigruber was primarily responsible for the day-to-day operations of AMC, and the two shared responsibility for TET. It is uncontroverted, however, that Dr. Kruger was responsible for the finance and accounting aspects of AMC, TET and TMB and that Mr. Eibruger was responsible for the sales, marketing and process technology aspects of the companies. Dr. Kruger and Mr. Eigruber reported directly to Reinhard Theysohn. During this same time frame, Stephen D. Root, AMC's chief financial officer since 1986, began reporting directly to Ernst Kruger. As AMC's chief financial officer, Mr. Root was responsible for the financial books and records of AMC, including the internal and external financial reporting of AMC.

Effective December 31, 1994, Reinhard Theysohn left the VGT organization and resigned his positions with the various Theysohn companies. Mr. Theysohn was replaced by Dr. Stefan Schatz, who began working for VGT and its subsidiaries in February 1995. Dr. Kruger left the Theysohn companies in April 1995. The record does not reflect whether anyone replaced Dr. Kruger.

### C. The Fraudulent Scheme

It is uncontroverted among the parties that, in the years prior to Battenfeld's acquisition of AMC, false entries were made in AMC's books and accounting records. It is further undisputed that Mr. Root was primarily responsible for creating and maintaining the fraudulent entries in AMC's financial books and records. The hotly contested issue with respect to the scheme is whether Mr. Root was acting on his own when he engaged in the fraudulent activity or whether he was acting on instructions from Mr. Theysohn and/or Dr. Kruger.

The following is a summary of Mr. Root's description of the fraudulent scheme.[2] Mr. Root testified that Mr. Theysohn first approached him in 1993 concerning losses that AMC had suffered that year. According to Mr. Root, Mr. Theysohn told Mr. Root that any losses suffered by AMC "would not be beneficial for the group," meaning VGT, FTG, AMC, TET and TMB. Thus, Mr. Theysohn allegedly instructed Mr. Root to "come up with sufficient inventory to offset the losses of [AMC] for the coming year and to use trial and evaluation inventory . . . to increase inventory to increase profits."[3] After receiving this purported instruction from Mr. Theysohn, Mr. Root established some fictitious T & E accounts with existing AMC customers. Thus, AMC's books showed that certain customers possessed T & E inventory. In reality, the inventory simply did not exist. According to Mr. Root, this action resulted in AMC having a "break even" or a "slightly profitable" year for 1993.

In late 1993, according to Mr. Root, Dr. Kruger approached him concerning losses that TET had suffered during the year. Mr. Root testified that Dr. Kruger wanted to bring TET to a "break even" point and, in that regard, instructed Mr. Root to purchase certain product from TET in order to generate a profit at TET. AMC then billed the product to Fortilit, an AMC customer in South America. Although the transaction was shown as an account receivable by TET, the product was never shipped to AMC and AMC never paid for the product. The record is unclear with respect to whether the product was ever actually sold to Fortilit.

In the summer of 1994, according to Mr. Root's testimony, Mr. Theysohn allegedly approached Mr. Root to discuss problems the Theysohn group was having with profitability. During this discussion, Mr. Theysohn purportedly advised Mr. Root that Dr. Kruger would be contacting Mr. Root to devise "a way to pump up the financial statements of the Theysohn group." Mr. Root further testified that Dr. Kruger contacted him in the fall of 1994 and asked Mr. Root to "set up some phony receivables" in order to improve the profitability of AMC and, thus, "improve the profitability of the group in general." Dr. Kruger allegedly told Mr. Root that approximately $5.5 million in losses needed to be "covered." Accordingly, Mr. Root created various fictitious customers and related accounts receivable. In that regard, Mr. Root employed Cheryl Kramer, a former colleague, to travel to various cities throughout the Midwest and open up post office boxes in the names of the fictitious customers. Later, when BKD was conducting its audit of AMC, Ms. Kramer would return to those cities and send confirmations back to BKD in the names of those fictitious customers.[4] Mr. Root also recruited the efforts of several AMC employees, including Marlene Clements, Barb McNichols, Rick Shober, Teresa Ungaro,

---

2. Both Mr. Theysohn and Dr. Kruger vigorously deny any knowledge of or participation in Mr. Root's activities.

3. "Trial and evaluation" inventory, or T & E inventory, is similar to consignment goods. The inventory is owned by AMC, but customers are permitted to use the inventory to assess whether they ultimately want to purchase the inventory.

4. During its audits of AMC, BKD would send confirmation letters to all customers owing amounts to AMC. The purpose of such letters is to verify that the customer owes the amount due.

Kerry Dallen, Debbie Shadday and Terry Bupp. These individuals participated in the creation of certain documents that facilitated the scheme (*e.g.*, invoices, packing lists, bills of lading).[5] Mr. Root testified that this scheme created anywhere from $3.5 million to $4 million of profit on AMC's books for 1994. According to Mr. Root, these fictitious customers and related accounts receivable were maintained throughout the following year, 1995, and into 1996.

### D. Battenfeld's Acquisition of AMC

As soon as Dr. Schatz began his employment with VGT in February 1995, he was approached by both Battenfeld and Cincinnati Millicron, one of Battenfeld's competitors, about the sale of AMC, TET and TMB. After some initial discussions with both companies, Dr. Schatz met with Dr. Helmut Eschwey, Battenfeld's president, in March 1995 to discuss in more detail Battenfeld's offer to purchase the three companies and to discuss alternatives to the offer. Ultimately, Drs. Schatz and Eschwey decided to explore Battenfeld's purchase of AMC only. According to Dr. Schatz, he decided to sell AMC because of his belief that VGT's sales were not strong enough to allow it to compete successfully in the world market and that, as a result, VGT should focus its efforts on the European market.

In April 1995, Drs. Schatz and Eschwey began to negotiate the specifics of the acquisition. Shortly thereafter, Battenfeld put together a due diligence team and began reviewing AMC's financial condition.[6] In that regard, in May 1995, Dr. Eschwey and Battenfeld's due diligence team met with Dr. Schatz, Mr. Eigruber, Mr. Root and Mark West, a partner with BKD, AMC's auditor. During this meeting, Battenfeld's due diligence team reviewed, *inter alia*, AMC's audited financial statements from recent years, and BKD's 1993 and 1994 work papers concerning AMC, including BKD's 1993 and 1994 audit reports. In July 1995, Mr. West, Karen Williams (an auditor with BKD) and AMC representatives met with Battenfeld's due diligence team and Battenfeld's accountants, Coopers & Lybrand, to discuss the implications of Battenfeld's purchase of AMC on BKD's 1995 mid-year audit of AMC.

The purchase price of AMC was $8.4 million. Battenfeld paid the purchase price in two installments—Battenfeld paid roughly $4.3 million to FTG on July 1, 1995, and paid the remaining $4.1 million to FTG on September 13, 1995. In addition, during the next year, Battenfeld and SMS invested certain sums in AMC or loaned those sums to AMC.[7] In July or August 1996, however, the fraudulent scheme was uncovered. Although the record is unclear, the scheme was apparently uncovered either because Mr. Eigruber disclosed the scheme to Dr. Eschwey[8] or because Battenfeld's auditor, Coopers & Lybrand, discovered elements of the fraud during an annual audit of AMC's financial statements and commenced an investigation. In any event, shortly thereafter, the nature and extent of the fraudulent scheme was revealed. Mr. Root's employment was terminated in September 1996.

In September 1997, Battenfeld entered into a settlement agreement with VGT and

---

5. Apparently, these individuals agreed to participate in the fraudulent scheme because they feared losing their jobs if they declined.

6. The record reveals that Battenfeld's due diligence team was actually organized in 1993, when discussions between Battenfeld and Reinhard Theysohn first began about a potential purchase of AMC, TET and TMB. For whatever reason, those discussions eventually ceased and did not start again until Dr. Eschwey approached Dr. Schatz in February 1995.

7. For purposes of its damages analysis, Battenfeld characterizes these cash infusions as "investments," while BKD characterizes them as loans.

8. Although Mr. Eigruber participated in the 1993 Fortilit transaction, he testified that he had no knowledge of any other fraudulent activity at AMC until March 1996, when Mr. Root revealed the scheme to him.

FTG. In that regard, Battenfeld released VGT and FTG from any potential claims Battenfeld may have had against those entities. In exchange, FTG paid Battenfeld more than $9 million. Approximately $7.7 million of this payment was made pursuant to an equity guarantee provision in the purchase agreement under which FTG agreed to indemnify Battenfeld for any difference between AMC's guaranteed equity of $4.6 million and its actual equity.

## II. Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal–Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* (citing *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Id.* at 670–71. In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Id.* at 671 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505; *see Adler,* 144 F.3d at 671 n. 1 (concerning shifting burdens on summary judgment). The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505. Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler,* 144 F.3d at 671. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.*

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex,* 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).

## III. BKD's Motion for Summary Judgment Based on K.S.A. § 1–402

In the pretrial order, plaintiffs Battenfeld/SMS contend that defendant BKD negligently performed professional accounting services in connection with its audits of AMC's 1993, 1994 and 1995 financial statements. BKD moves for summary judgment on plaintiffs' claims based on K.S.A. § 1–402, which defines the circumstances under which an individual or entity may bring a cause of action against an accountant or accounting firm for professional negligence. According to BKD, the uncontroverted facts demonstrate that plaintiffs have not met the requirements of § 1–402 and, as a result, summary judgment in its favor is appropriate. As set forth below, the court finds that genuine issues of material fact exist with respect to whether plaintiffs Battenfeld and SMS Capital Corporation have met the requirements of § 1–402. Thus, BKD's motion for summary judgment is denied with respect to these plaintiffs. With respect to

SMS Finance Corporation, however, the uncontroverted facts demonstrate that the requirements of § 1–402 have not been met. Accordingly, summary judgment in favor of BKD on the claims of SMS Finance Corporation is granted.

The starting point for the court's analysis is the language of the statute itself. Section 1–402 states in pertinent part:

> No ... partnership or registered firm authorized to practice as a certified public accountant ... shall be liable to any person or entity for civil damages resulting from acts, omissions, decisions or other conduct amounting to negligence in the rendition of professional accounting services unless:
>
> (a) The plaintiff directly engaged such ... registered firm to perform the professional accounting services; or
>
> (b) (1) the defendant knew at the time of the engagement or the defendant and the client mutually agreed after the time of the engagement that the professional accounting services rendered the client would be made available to the plaintiff, who was identified in writing to the defendant; and (2) the defendant knew that the plaintiff intended to rely upon the professional accounting services rendered the client in connection with specific transactions described in writing.

K.S.A. § 1–402 (1991 & Supp.1998). It is undisputed that subsection (a) is inapplicable to the facts presented here. To maintain their malpractice action against BKD, then, plaintiffs Battenfeld/SMS must come forward with sufficient facts from which a reasonable jury could conclude that (1) BKD knew at the time of the engagement (or that BKD and its client, AMC, mutually agreed after the time of the engagement) that the professional accounting services rendered AMC would be made available to Battenfeld/SMS, who was identified in writing to BKD; and (2) BKD knew that Battenfeld/SMS intended to rely upon the professional accounting services rendered AMC in connection with specific transactions described in writing.

### A. Plaintiff Battenfeld

■ With respect to the first prong of § 1–402(b), Battenfeld has come forward with sufficient facts from which a reasonable jury could conclude that BKD and AMC mutually agreed that the services rendered AMC would be made available to Battenfeld, who was identified in writing to BKD. The specific services rendered AMC for purposes of analyzing BKD's case are those provided by BKD in connection with its 1993, 1994 and 1995 audits of AMC's financial statements, including BKD's audit reports for those years. Mark West, a partner with BKD, was the person primarily responsible for BKD's 1993, 1994 and 1995 audits of AMC's financial statements. Mr. West testified in his deposition that Battenfeld was allowed access to BKD's 1993 and 1994 work papers concerning AMC, including BKD's 1993 and 1994 audit reports. According to Mr. West, BKD and AMC provided Battenfeld with these materials in May 1995, when Mr. West and representatives of his client, AMC, met with Battenfeld representatives in connection with Battenfeld's potential purchase of AMC. Although Battenfeld may not have been identified in writing to BKD at that stage of the acquisition process, a jury could reasonably infer that Battenfeld was sufficiently "identified in writing to BKD" just two months later, when BKD received a copy of the purchase and supplemental agreements between Battenfeld and AMC's owner. With respect to BKD's 1995 audit report, a reasonable jury could conclude from the facts presented here that BKD and AMC agreed that BKD's 1995 audit report would be provided to Battenfeld. In July 1995, Mr. West, Karen Williams (an auditor employed by BKD) and AMC representatives met with Battenfeld representatives and Battenfeld's accountants, Coopers & Lybrand, to discuss the implications of Battenfeld's purchase of AMC on BKD's 1995 audit of AMC. During this meeting, BKD was given a copy of the purchase agreement (in German) and two English translations of the agreement. The purchase agreement

provided that any losses suffered by AMC during the first six months of 1995 would be borne by the seller. In other words, the purchase price would be reduced based on any losses as evidenced in AMC's 1995 financial statements. Based on this provision of the agreement, BKD understood, according to Ms. Williams, that its 1995 audit report would be provided to Coopers & Lybrand and that Battenfeld, via Coopers & Lybrand, would receive a copy of BKD's 1995 audit report as well. Moreover, as set forth briefly above, a reasonable jury could conclude that Battenfeld was identified in writing to BKD when BKD was provided with a copy of the purchase and supplemental agreements in July 1995.

With respect to the second prong of § 1–402(b), Battenfeld has similarly come forward with facts from which a reasonable jury could infer that BKD knew that Battenfeld would rely on the services rendered AMC in connection with Battenfeld's purchase of AMC, as described in the purchase agreement. Based on Mr. West's testimony concerning Battenfeld's May 1995 review of BKD's 1993 and 1994 audit reports and work papers, a reasonable jury could conclude that Mr. West knew that Battenfeld was relying on these materials in connection with its initial decision to purchase AMC, a transaction that was eventually set forth in writing and provided to BKD. Moreover, both Mr. West and Ms. Williams testified to their knowledge that, pursuant to the purchase agreement, Battenfeld would pay less for AMC if AMC's 1995 financial statements—statements that were audited by BKD—revealed that AMC suffered losses during the first six-months of that year. A jury could reasonably conclude from this evidence that Mr. West and Ms. Williams were aware that the parties to the purchase agreement (including Battenfeld) would rely on BKD's 1995 audit report of AMC in determining the purchase price of AMC. The record also includes a memorandum drafted by Ms. Williams in which she memorializes discussions that took place during BKD and AMC's July 1995

meeting with Battenfeld representatives and Coopers & Lybrand representatives. According to the memorandum, the meeting was held to discuss the "Battenfeld contract and its impact on the June 30, 1995 audit of AMC." Along those lines, the memorandum indicates that certain "higher risk" areas were discussed "that BKD will address in the 6/30/95 audit." A reasonable jury could infer from this document that Battenfeld intended to rely on BKD's 1995 audit—particularly with respect to those "higher risk" areas—in connection with its purchase of AMC.

In light of the facts set forth above, a reasonable jury could conclude that the requirements of § 1–402(b)(1) and (b)(2) have been met with respect to plaintiff Battenfeld. BKD's motion for summary judgment against plaintiff Battenfeld based on § 1–402 is denied.

### B. Plaintiffs SMS Capital Corporation and SMS Finance Corporation

The court now turns to analyze BKD's motion for summary judgment based on § 1–402 with respect to the SMS plaintiffs. In their response to BKD's motion, the SMS plaintiffs direct the court to three sets of documents in which the SMS plaintiffs were allegedly identified to BKD for purposes of § 1–402(b)(1): (1) the purchase agreement and supplemental agreement (including the German version and English translations); (2) two memoranda from Karen Williams to Larry Grinstead, Ms. Williams' supervisor at BKD; and (3) a Coopers & Lybrand internal memorandum concerning tax due diligence work performed in connection with the sale of AMC. As set forth below, the court concludes that none of these documents identifies SMS Finance Corporation to BKD within the meaning of § 1–402(b)(1). Accordingly, BKD's motion for summary judgment with respect to SMS Finance Corporation is granted and the claims of SMS Finance Corporation are dismissed. With respect to SMS Capital Corporation, however, a reasonable jury could conclude

from the record evidence that the provisions of § 1–402 have been satisfied. Thus, BKD's motion for summary judgment with respect to SMS Capital Corporation must be denied.

According to the SMS plaintiffs, "SMS" was adequately identified in the purchase agreement and the supplemental agreement.[9] It is undisputed that neither the term "SMS" nor the phrases "SMS Capital Corporation" or "SMS Finance Corporation" (or any variations of these phrases) appear anywhere in the purchase or supplemental agreements. References are made in the agreements, however, to "the Battenfeld Group," a group of companies which allegedly includes SMS Capital Corporation and SMS Finance Corporation. Plaintiffs' argument, then, is that SMS was sufficiently "identified in writing" to BKD because the purchase and supplemental agreements contain references to "the Battenfeld Group." The court disagrees.

As an initial matter, the court has found only two references in the agreements (and plaintiffs have directed the court to only two references) to the "Battenfeld Group." Both references appear in paragraph 13 of the German version of the supplemental agreement (*i.e.*, "Gruppe Battenfeld"). For whatever reason, paragraph 13 does not appear in the English translation of the supplemental agreement. In the absence of evidence on the point, the court is reluctant to assume that anyone at BKD reviewed the German documents containing the "Gruppe Battenfeld" references. Even assuming, however, that BKD did notice the "Gruppe Battenfeld" phrase (and assuming that BKD understood the translation of the phrase), there is no evidence in the record before the court that anyone at BKD knew that "the Battenfeld Group" specifically included SMS Finance Corporation or SMS Capital Corporation. In short, no reasonable jury could conclude that a (German) reference to "the Battenfeld Group" sufficiently identified either SMS Capital Corporation or

SMS Finance Corporation to BKD such that the SMS plaintiffs could hold BKD liable for alleged professional negligence under § 1–402.

In another effort to demonstrate that they were "identified in writing to BKD" for purposes of § 1–402(b)(1), the SMS plaintiffs direct the court to certain memoranda that Karen Williams drafted and sent to her supervisor at BKD, Larry Grinstead. The first memorandum reads, in pertinent part, as follows:

> Effective July 1, 1995, American Maplan was sold to another German Corp. and has therefore changed its year end to June 30th to conform to its new parent's year end. We are therefore performing a June 30, 1995 audit of the Company. The equity of AMC at June 30 will then be used to determine the sales price. As a result, the new parent Company, SMS, has sent a representative to oversee the year end closing. They have also sent their auditors, Coopers & Lybrand, to review our audit files and make sure there are no unresolved issues.

The second memorandum contains much of the same information. It reads, in pertinent part, as follows:

> The issue on the deferred compensation plans was raised by both SMS, AMC's new parent company, and Coopers & Lybrand, SMS's auditors. We have reviewed the employment contracts in the past and have concluded that no accrual is required. Mark wanted me to run this by you to make sure we are on track. We are in somewhat of a rush to get an answer as the closing on the sale is August 14th. The auditors from Coopers & Lybrand will be here next Wednesday, August 9th to review our files.

It is beyond dispute that Ms. Williams identified "SMS" to her supervisor in these writings. There is no reference, however, to either SMS Finance or SMS Capital, the two named SMS plaintiffs in this ac-

---

9. The SMS plaintiffs make no effort to distinguish between "SMS Finance Corporation" or "SMS Capital Corporation" and simply refer to both plaintiffs as "SMS."

tion. Moreover, as BKD argues, the court simply cannot conclude that BKD's own internal memoranda are sufficient to satisfy the "identified in writing to BKD" requirement of § 1–402(b)(1). Presumably, the underlying purpose of § 1–402 is to ensure that an accounting firm is not held liable to persons or entities for alleged negligence unless the firm knew that such persons or entities intended to rely on services rendered to the firm's client. The writing requirement of § 1–402(b)(1), in turn, furthers the purpose of the statute by contemplating some type of disclosure or notification to the accounting firm from either its client or third-parties that a third-party intends to use the services provided to the client. In other words, the plain meaning of the phrase "identified in writing *to the defendant*" implies that some person or entity other than the defendant itself must put the defendant on notice that some person or entity other than the client intends to use the services rendered the client. Thus, third-party references contained in BKD's internal working papers do not meet the statutory writing requirement.

■ The final document on which the SMS plaintiffs rely in support of their assertion that they were adequately identified in writing to BKD is an internal Coopers & Lybrand memorandum from a Coopers & Lybrand auditor to the "SMS–American Maplan Corp. Tax Due Diligence" file. This internal memorandum eventually made its way to BKD via AMC. The document contains no reference to "SMS Finance Corporation." Thus, because the SMS plaintiffs have failed to come forward with any document whatsoever identifying SMS Finance Corporation to BKD, summary judgment in favor of BKD on the claims of SMS Finance Cor-

poration is warranted. The Coopers & Lybrand report does, however, identify Battenfeld as "a wholly owned subsidiary of SMS Capital Corporation (SMS)." A reasonable jury could conclude, based on this document, that SMS Capital Corporation was sufficiently "identified in writing" to BKD for purposes of satisfying the writing requirement of § 1–402(b)(1).[10] Moreover, this document, together with Karen Williams' memoranda, constitutes sufficient evidence from which a reasonable jury could infer that BKD and AMC had agreed that BKD's services—particularly BKD's 1995 audit report and working papers—would be made available to SMS Capital Corporation in connection with the AMC acquisition and that SMS Capital Corporation intended to rely on BKD's audit reports and working papers in connection with that acquisition as described in the purchase agreement.[11]

In sum, no reasonable jury could conclude, based on the facts presented to the court, that SMS Finance Corporation was identified in writing to BKD within the meaning of § 1–402(b)(1). Summary judgment in favor of BKD is appropriate, therefore, with respect to the claims of SMS Finance Corporation. Summary judgment is denied, however, as to SMS Capital Corporation.

### IV. BKD's Motion for Summary Judgment on Plaintiffs' Claims and on Counts III–V of AMC's Amended Counterclaim

The court now turns to address BKD's remaining motion for summary judgment. In its motion, BKD asserts that it is entitled to summary judgment on Battenfeld's claims because Battenfeld has no compe-

---

**10.** BKD argues that the Coopers & Lybrand report is not sufficient to satisfy the writing requirement because the report was not sent to BKD until August 24, 1995, at least one week after BKD had completed its 1995 audit. There is no statutory requirement, however, that parties be identified in writing to the accounting firm prior to the completion of the firm's services.

**11.** BKD asserts that SMS Capital Corporation could not have relied on its 1995 audit report because the audit report was issued after SMS Capital infused $15 million into AMC on August 17, 1995. The evidence reflects, however, that SMS Capital Corporation infused additional monies into AMC after BKD's audit report was issued.

tent proof with respect to its measure of damages and, in any event, that summary judgment is appropriate because Battenfeld has not suffered any actual, unrecovered losses. In its motion, BKD also sets forth an independent basis for summary judgment with respect to Battenfeld's and AMC's breach of contract claims against BKD. Specifically, BKD asserts in support of its motion that the parties' breach of contract claims fail as a matter of law because the nature of these claims sounds in tort rather than contract. As set forth in more detail below, the court will defer ruling on BKD's motion with respect to Battenfeld's measure of damages until after the *Kumho* hearing scheduled later this month. If, however, after the *Kumho* hearing, the court determines that Battenfeld's measure of damages is inappropriate or otherwise precludes Battenfeld's expert witness, Larry Morriss, from testifying at trial, then BKD may be entitled to summary judgment on Battenfeld's claims as described more fully below. With respect to Battenfeld's and AMC's breach of contract claims, the court agrees with BKD that those claims sound in tort and, accordingly, that summary judgment on those claims is warranted.

### A. Damages Suffered by Battenfeld

■ The parties agree that the appropriate measure of damages for Battenfeld's negligent misrepresentation claim is found in section 552B of the Restatement (Second) of Torts.[12] Pursuant to that section, a plaintiff can recover those damages necessary to compensate him "for the pecuniary loss to him of which the misrepresentation is a legal cause, including (a) the difference between the value of what he

has received in the transaction and its purchase price or other value given for it; and (b) pecuniary loss suffered otherwise as a consequence of the plaintiff's reliance upon the misrepresentation." Restatement (Second) of Torts § 552B(1) (1977). Section 552B(2) specifically excludes from plaintiff's recoverable damages "the benefit of the plaintiff's contract with the defendant." *Id.* § 552B(2).

While the parties agree that section 552B provides the appropriate framework for measuring Battenfeld's damages,[13] the parties diverge dramatically with respect to the proper application of that framework to the facts of the case. Specifically, BKD challenges two aspects of Battenfeld's analysis of its damages. First, Battenfeld's expert, Larry Morriss, for purposes of computing the "value given" prong of section 552B(1)(a), has included the "investments" or cash infusions that Battenfeld and SMS made into AMC. According to BKD, these "investments" were, in reality, loans that AMC is in the process of repaying and, therefore, should not be included in the "value given" component of 552B(1)(a). Second, Mr. Morriss, for purposes of computing the "value received" prong of section 552B(1)(a), has valued AMC using a liquidation analysis rather than a "going concern" analysis. According to BKD, Mr. Morriss' use of a liquidation method of valuation is legally inappropriate. While the court has some doubts with respect to whether a liquidation analysis is appropriate in this case, the court has found no cases suggesting that the method of valuation is a question of law to be determined at the summary judgment stage. Moreover, section 552B

12. In addition to its claim against BKD for negligent misrepresentation, Battenfeld asserts a claim for ordinary negligence. The parties do not suggest whether a different measure of damages would apply to Battenfeld's negligence claim.

13. The Kansas Supreme Court has adopted section 552 of the Restatement (Second) of Torts, which provides a cause of action for negligent misrepresentation. *See Mahler v.*

*Keenan Real Estate, Inc.*, 255 Kan. 593, 604, 876 P.2d 609 (1994). Although the Kansas Supreme Court has not specifically adopted section 552B of the Restatement, several judges in this District have previously limited damages for claims based on negligent misrepresentations in a similar manner. *See Kreekside Partners v. Nord Bitumi U.S., Inc.,* No. CIV.A. 95–2580–EEO, 1997 WL 618761, at *9–10 (D.Kan. Sept.16, 1997) (and cases cited therein).

does not appear to shed any light on which method of valuation would be appropriate in a given case. Thus, the court is not prepared, at this stage of the litigation, to preclude Mr. Morriss from testifying as to Battenfeld's damages using a liquidation valuation. Similarly, the court questions Mr. Morriss' inclusion of the cash infusions to AMC for purposes of computing the "value given" aspect of section 552B(1)(a), particularly in the absence of any evidence that Battenfeld did not realize the benefit it expected from those infusions and in light of evidence suggesting that AMC is repaying at least some of those monies to Battenfeld. Despite these grave concerns about Mr. Morriss' computation of Battenfeld's damages, the court is not prepared to state, as a matter of law, that Mr. Morriss' analysis is so flawed as to preclude his testimony at trial. Nonetheless, the court anticipates hearing testimony from Mr. Morriss at the *Kumho* hearing concerning his assessment that a liquidation analysis is the appropriate method of valuation in this case and his inclusion of Battenfeld's cash infusions or loans to AMC as "value given" for purposes of section 552B. After the hearing, if the court is convinced that a liquidation method of valuation is inappropriate and that Mr. Morriss should be precluded from testifying as an expert witness in this case, then summary judgment for BKD would be appropriate for the reasons set forth below.[14]

It is beyond dispute that a plaintiff is limited to one recovery for a wrong. *See York v. InTrust Bank, N.A.,* 265 Kan. 271, 311, 962 P.2d 405 (Kan.1998). This rule is consistent with the underlying principle of damages—"to make a party whole by putting him or her back in the same position as if the injury had not occurred, not to grant a windfall." *See Short v. Wise,* 239 Kan. 171, 178, 718 P.2d 604 (1986) (citing *State ex rel. Stephan v. Wolfenbarger & McCulley, P.A.,* 236 Kan. 183, 690 P.2d 380

(1984)). Kansas courts have applied the "single recovery" rule in situations where partial payments have been made by multiple tortfeasors. *InTrust Bank,* 265 Kan. at 311, 962 P.2d 405. In such circumstances, "[a] pro tanto credit has been granted to prevent a plaintiff from receiving a double recovery." *Id.* As the Kansas Supreme Court recently reiterated:

> It is a just and well-established doctrine that there shall be but one satisfaction accorded for the same wrong. If one be injured by a tortious act, he is entitled to compensation for the injuries suffered, and, if several persons are guilty in common of the tort, the injured one has his right of action for damages against each and all of the joint tortfeasors, and may at his election sue them individually or together. But if he receive [sic] full satisfaction from one of them, his right of action against the other is thereby extinguished.
>
> . . . .
>
> When a right of action is once satisfied it ceases to exist. If part satisfaction has already been obtained, further recovery can only be had of a sum sufficient to accomplish satisfaction. It is not necessary that the party making payment in partial satisfaction was in fact liable. Anything received on account of the injury inures to the benefit of all and operates as a payment *pro tanto.* The plaintiff is entitled to only one satisfaction from whatever source it may come.

*Id.* at 311–312, 962 P.2d 405 (quoting *Jacobsen v. Woerner,* 149 Kan. 598, 89 P.2d 24 (1939)).

As BKD highlights in its papers, Battenfeld settled its dispute with FTG and VGT for more than $9 million. If the court rejects Battenfeld's measure of damages as a matter of law and is left with only BKD's measure of damages (BKD mea-

---

14. Indeed, Battenfeld does not appear to dispute that summary judgment in favor of BKD would be warranted if Battenfeld's proposed measure of damages is deemed inappropriate.

In its papers, Battenfeld simply argues that its measure of damages is accurate and that it has suffered actual, unrecovered losses.

sures Battenfeld's damages as $7.7 million—the difference between AMC's guaranteed equity and actual equity at the time of the acquisition), then it would seem that Battenfeld has already recovered more than it lost. The mere fact that Battenfeld recovered $9 million, however, would not, by itself, preclude Battenfeld's recovery against BKD. Battenfeld would have an opportunity to demonstrate that it is entitled to pursue BKD for damages which are separate, distinct, and in excess of the monies it recovered from FTG and VGT. *See Raben Builders, Inc. v. First American Bank & Trust Co.*, 561 So.2d 1229, 1231 (Fla.Dist.Ct.App.1990). In that vein, if some portion of the monies paid by FTG and VGT to Battenfeld were allocated for punitive damages or for some potential claim under German law that Battenfeld released, then that portion of the settlement would not be credited against the amount Battenfeld could potentially recover from BKD. If Battenfeld failed to show that it was entitled to pursue BKD for additional sums apart from those sums recovered from FTG and VGT, then, in light of the above authorities, Battenfeld would not be entitled to further recovery and, consequently, its claims against BKD would be extinguished. *See id.* at 312–13, 962 P.2d 405.[15] Indeed, other sources have reached this conclusion in the same context. *See, e.g., Raben Builders, Inc. v. First American Bank & Trust Co.*, 561 So.2d 1229, 1230–31 (Fla.Dist.Ct.App.1990) (affirming summary judgment in favor of accountant in malpractice action where plaintiff had been fully compensated for its loss by way of settlement with another defendant); *see also* George Spellmire et al., *Accounting, Auditing, and Financial Malpractice* § 5.16, at 86–87 (Harcourt Brace & Company 1998) ("[W]hen damages are recoverable from an accountant and another entity jointly responsible for the loss and the plaintiff recovers in full from the other entity, the plaintiff cannot recover from the accountant."). Thus, assuming that BKD's measure of damages is accurate, and assuming further that Battenfeld could not pursue BKD for damages which were separate and distinct from those already recovered from FTG and VGT, then BKD would be entitled to summary judgment on Battenfeld's claims.

### B. The Breach of Contract Claims

In the pretrial order, both Battenfeld and AMC assert breach of contract claims against BKD. Specifically, AMC alleges that BKD breached its contracts with AMC for the 1993, 1994 and 1995 audits of AMC's financial statements for those years. Battenfeld asserts a breach of con-

---

**15.** The court notes that the Kansas Supreme Court's decision in *York v. InTrust Bank, N.A.* involved joint tortfeasors in an intentional tort action. 265 Kan. at 310–11, 962 P.2d 405. Negligence was not alleged anywhere in the pleadings. *Id.* at 310, 962 P.2d 405. In *Glenn v. Fleming*, 240 Kan. 724, 732 P.2d 750 (1987), however, the Kansas Supreme Court addressed whether a verdict could be reduced by the amount the plaintiff received from a settlement with another defendant in the context of a comparative negligence action. In *Fleming*, the Court held that a verdict could not be reduced by the amount of the plaintiff's settlement with another defendant where the remaining defendant had the opportunity to have the jury compare the fault of the settling defendant but failed to do so. 240 Kan. at 731–32, 732 P.2d 750.

*Fleming*, of course, is different from this case because the court has concluded that this case is simply not a comparative negligence case and, thus, BKD will not be permitted to compare the fault of any other parties at trial. *InTrust Bank*, however, is not directly on point either because this case does not involve joint tortfeasors accused of intentional conduct, but rather involves one party accused of negligent conduct and another party accused of intentional conduct. Nonetheless, the *Fleming* court seemed to suggest that the defendant could have protected himself by comparing his fault to the fault of the settling defendant and his failure to do so, when considered in light of Kansas' comprehensive comparative fault scheme, appears to have been pivotal in the court's decision. Because BKD here cannot compare its fault to the settling parties and, therefore, the sanctity of the comparative fault regimen does not drive the result, the court concludes that BKD is entitled to the protections of the principles set forth in *InTrust Bank*.

tract claim against BKD as an alleged third-party beneficiary of the contracts between BKD and AMC. The only issue raised by BKD's motion is whether the nature of these claims sounds in contract, as Battenfeld and AMC contend, or tort, as BKD urges.

Whether the nature of a claim sounds in tort or contract is "determined from the pleadings ... and from the real nature and substance of the facts therein alleged." *Bonin v. Vannaman,* 261 Kan. 199, 208, 929 P.2d 754 (1996). Under Kansas law, the test for determining whether a claim falls under tort law or contract law is as follows:

> When an act complained of is a breach of specific terms of the contract, without any reference to the legal duties imposed by law upon the relationship created thereby, the action is in contract, but where there is a contract for services which places the parties in such a relationship to each other that, in attempting to perform the promised service, a duty imposed by law as a result of the contractual relationship between the parties is violated through an act which incidentally prevents the performance of the contract, then the gravamen of the action is a breach of the legal duty, and not of the contract itself.

*Malone v. University of Kansas Med. Ctr.,* 220 Kan. 371, 375–76, 552 P.2d 885 (1976) (citation omitted). Accordingly, Kansas courts have consistently held that "the difference between a tort and a contract action is that a breach of contract is a failure of performance of a duty arising or imposed by agreement; whereas, a tort is a violation of a duty imposed by law." *Tamarac Dev. Co. v. Delamater, Freund & Assocs., P.A.,* 234 Kan. 618, 619–20, 675 P.2d 361 (1984); *accord Hunt v. KMG Main Hurdman,* 17 Kan.App.2d 418, 423, 839 P.2d 45 (1992). While elements of both tort and contract may be present in a given case, the key difference is whether the contract calls for "a specific result." *See Hunt,* 17 Kan.App.2d at 423, 839 P.2d

45 (citing *Tamarac Dev. Co.,* 234 Kan. at 621, 675 P.2d 361).

In its engagement letters to AMC, BKD expressly agreed to conduct its audits "in accordance with generally accepted auditing standards [in order to provide] a reasonable basis to express an opinion on the conformity of [AMC's] financial statements, in all material respects, with generally accepted accounting principals." According to Battenfeld and AMC, BKD's promise to perform a GAAS audit imposed a contractual duty separate and apart from any duty imposed by law. The court disagrees.

The Kansas Supreme Court has addressed the precise issue before the court today. *See Brueck v. Krings,* 230 Kan. 466, 638 P.2d 904 (1982). In *Brueck,* the Kansas Savings and Loan Association hired Peat, Marwick to perform an audit of Kansas Savings' books for the fiscal year ending June 30, 1971. *See id.* at 468, 638 P.2d 904. An engagement letter between the parties set forth the details of the proposed audit. *Id.* Two subsequent audits were performed under oral agreements for the fiscal years 1972 and 1973. *Id.* After the Kansas Savings and Loan Association collapsed, plaintiffs filed suit against Peat, Marwick (and others) alleging, *inter alia,* that Peat, Marwick breached implied and express warranties in failing to conduct the audit according to generally accepted accounting principles. *Id.* at 469, 638 P.2d 904.

Although the plaintiffs characterized this claim as a breach of contract claim for purposes of ascertaining the relevant statute of limitations, the trial judge held that the claim sounded in tort and, accordingly, applied a shorter statute of limitations. *Id.* On appeal, the Kansas Supreme Court, applying the test set forth in *Malone,* affirmed the decision of the trial judge. *See id.* at 469–70, 638 P.2d 904. As the court stated:

> [P]laintiffs do not claim that Peat, Marwick failed to perform its contract; the audits for the years 1971, 1972 and

1973 were performed, completed and delivered. The wrongs alleged by the plaintiffs were that Peat, Marwick failed to perform those audits in accordance with the duties imposed on it, not by the specific terms of the contracts, but by the Kansas savings and loan code, the Kansas securities law, and the professional standards of the accounting profession. The claimed breach of implied and express warranties ... arose not from duties imposed and promised by contract, but imposed by law. In short, plaintiffs claim that Peat, Marwick failed to exercise that reasonable care which the law requires.

*See id.*

Similarly, while the engagement letters here required BKD to perform an audit in accordance with generally accepted accounting standards, the gist of Battenfeld's and AMC's complaints is not that BKD failed to conduct the audits, but rather than it failed to conduct the audits with due care. In such circumstances, Battenfeld's and AMC's claims lie in negligence.

In a final effort to demonstrate that BKD breached specific contractual terms, Battenfeld and AMC direct the court to the memorandum drafted by Ms. Williams in which she memorializes discussions that took place during BKD and AMC's July 1995 meeting with Battenfeld representatives and Coopers & Lybrand representatives. According to Battenfeld and AMC, this memorandum demonstrates that BKD agreed to give "heightened scrutiny" to certain "high risk areas" in conducting its audit. The memorandum simply indicates that certain "higher risk" areas were discussed "that BKD will address in the 6/30/95 audit." It does not, standing alone, demonstrate that BKD contracted to provide such "heightened scrutiny" or any other standard beyond those necessitated by generally accepted auditing and accounting standards. Moreover, Battenfeld and AMC have failed to direct the court to any testimony or other evidence which might support their interpretation of the July memorandum. In the absence of such evidence, the court is unwilling to conclude, based solely on the language of Ms. Williams' memorandum, that BKD agreed to any other auditing or accounting standards than those set forth in its engagement letters with AMC.

In sum, the court concludes that the nature of Battenfeld's and AMC's claims here sounds in tort rather than contract law. BKD's motion for summary judgment with respect to Battenfeld's and AMC's breach of contract claims is granted.

## V. Battenfeld/SMS and AMC's Motion for Summary Judgment on BKD's Comparative Fault Designations

BKD seeks to compare its fault with the alleged negligent and intentional acts of twenty-six individuals or entities that it has designated in the pretrial order for comparative fault purposes. In their papers, the parties separate these individuals and entities into three categories: (1) the AMC designees, including AMC, Mssrs. Root and Eigruber, former members of AMC's board of directors and several AMC employees; (2) the FTG/VGT designees, including Theysohn entities FTG, VGT AG, Theysohn Extrusions Technik (TET) and Tehysohn Maschinenbau (TMB) and several officers of the various Theysohn entities including Reinhard Theysohn, Ernst Kruger and Dr. Stefan Schatz; and (3) the plaintiffs, including Battenfeld, SMS Capital Corporation and SMS Finance Corporation. Battenfeld and AMC maintain that they are entitled to summary judgment on each of BKD's comparative fault designations. As set forth in more detail below, the court concludes that summary judgment in favor of Battenfeld and AMC is appropriate with respect to each of BKD's comparative fault designations.

### A. The AMC Designees and the FTG/VGT Designees

In the pretrial order, BKD seeks to compare its negligence with the intentional and negligent conduct of the AMC desig-

nees and the FTG/VGT designees. With respect to the AMC designees, BKD alleges that AMC intentionally supplied false information and accounting records to both BKD and Battenfeld/SMS before the acquisition or, in the alternative, that AMC negligently supplied false information and accounting records to both BKD and Battenfeld/SMS before the acquisition. BKD further alleges in the pretrial order that AMC, both before and after the acquisition, negligently failed to notify BKD or Battenfeld/SMS of known or suspected inaccuracies or wrongdoing; negligently failed to monitor and supervise the actions of AMC officers and employees who participated in the fraudulent scheme; negligently failed to keep informed of corporate financial and accounting activities through an adequate reporting system; negligently failed to adequately scrutinize its financial and accounting reports; negligently failed to investigate suspicious records, reports and circumstances; and negligently failed to take adequate corrective measures. BKD's allegations with respect to the FTG/VGT designees mirror its comparative fault allegations against AMC and are based in large part on BKD's characterization of AMC as the "alter ego" of FTG and VGT.

### 1. Allegations of Intentional Conduct

 The court first turns to address whether BKD may compare its negligence to the intentional conduct of the AMC designees and the FTG/VGT designees. Under Kansas law, the intentional acts of a third party cannot be compared with the negligent acts of a defendant whose duty it is to protect the plaintiff from the intentional acts committed by the third party. *Kansas State Bank & Trust Co. v. Specialized Transp. Servs., Inc.,* 249 Kan. 348, 374, 819 P.2d 587 (1991) (citing *Gould v. Taco Bell,* 239 Kan. 564, 570, 722 P.2d 511 (1986); *M. Bruenger & Co. v. Dodge City Truck Stop, Inc.,* 234 Kan. 682, 686–87, 675 P.2d 864 (1984)). While BKD does not dispute this statement of the law, it contends that the rule is inapplicable to the facts here because it

did not have a duty to protect Battenfeld from the fraudulent conduct of the AMC designees or the FTG/VGT designees. As emphasized by Battenfeld and AMC, however, an analysis of BKD's comparative fault designations presupposes that BKD breached a duty owed to Battenfeld. In other words, if the court ultimately determines that BKD had no duty to protect Battenfeld, then the comparative fault issue becomes moot. If, on the other hand, the court concludes that BKD did have a duty to protect Battenfeld, and the jury determines that BKD breached its duty, then Kansas law prohibits a comparison of the intentional acts of the AMC designees or the FTG/VGT designees with BKD's negligence. For these reasons, BKD's attempt to compare its negligence with the intentional acts of the AMC designees and the intentional acts of the FTG/VGT designees fails as a matter of law. Summary judgment in favor of Battenfeld and AMC is appropriate on this issue.

### 2. Allegations of Negligent Conduct

 Having determined that BKD cannot attempt to compare its negligence with the intentional conduct of the AMC designees or the FTG/VGT designees, the court now turns to analyze BKD's comparative fault allegations with respect to the purported negligence of the AMC designees and the FTG/VGT designees. Although Battenfeld and AMC advance several arguments in support of their motion for summary judgment with respect to BKD's attempt to compare its negligence to the purported negligence of the AMC and FTG/VGT designees, the court finds one argument dispositive.

Specifically, Battenfeld and AMC argue that the record evidence simply does not support a negligence theory and, instead, demonstrates that the conduct at issue here was intentional. In response, BKD first maintains that it can compare its negligence with the conduct of the AMC and FTG/VGT designees because these individuals and entities committed "negli-

gence per se" by breaching certain duties owed Battenfeld/SMS under the Kansas Securities Act, K.S.A § 17–1252 et seq. As emphasized by Battenfeld and AMC, however, BKD, until it filed its response to Battenfeld and AMC's motion for summary judgment, had never raised a negligence per se theory at any time during this litigation and did not preserve this theory in the pretrial order. Accordingly, the court declines BKD's invitation to analyze its negligence per se theory at this late stage in the litigation process. *See Tyler v. City of Manhattan,* 118 F.3d 1400, 1403 (10th Cir.1997) (An order entered pursuant to Federal Rule of Civil Procedure 16(e) "supersedes the pleadings and controls the subsequent course of litigation.") (citing *Hullman v. Board of Trustees,* 950 F.2d 665, 668 (10th Cir.1991) ("[T]he pretrial order 'measures the dimensions of the lawsuit, both in the trial court and on appeal.' ")).

In addition to its argument that the conduct of the AMC and FTG/VGT designees constitutes negligence per se, BKD contends that certain facts in the record support the conclusion that the designees acted negligently, both pre-acquisition and post-acquisition. According to BKD, the following facts demonstrate that the AMC and FTG/VGT designees were negligent either before or after the acquisition:

- During the May 1995 meeting with Battenfeld representatives, Mr. Root presented information containing the fictitious accounts receivable, but he did not disclose that the information was inaccurate nor did he disclose the existence of the fictitious transactions.
- Dr. Stefan Schatz, Chair of the AMC Board of Directors, supplied false financial information to Battenfeld (*i.e.,* AMC's 1993 and 1994 financial statements and the unaudited, interim financial information dated April 30, 1995) despite knowing of prior inventory manipulations of AMC's financial statements. Moreover, he took no action to confirm or verify the accuracy of the information in the financial statements he presented to Battenfeld.

- During the May 1995 due diligence meeting with Battenfeld representatives, AMC's Chief Operating Officer and Board member Horst Eigruber did not disclose the 1993 Fortilit transaction, nor did he tell anyone at Battenfeld about Theysohn's constant demand for cash or AMC's cash flow problems.
- Horst Eigruber never disclosed the fictitious Eisenbeiss transaction to Battenfeld, either pre or post-June 30, 1995.
- Mssrs. Root and Eigruber failed to disclose the existence of fraud at AMC to anyone at Battenfeld or the new management of AMC until the fraud was discovered in July 1996.
- Dr. Schatz, who had knowledge of at least some fraudulent activities at AMC, continued on the AMC Board with Battenfeld representatives for one year after the acquisition and never disclosed any of the pre-existing fraud to Battenfeld.
- AMC employees Marlene Clements, Barb McNichols, Rick Shober, Teresa Ungaro, Kerry Dallen, Debbie Shadday and Terry Bupp failed to report (or "blow the whistle") to the members of AMC's new board of directors or to Battenfeld about their respective roles in preparing false financial documents and otherwise manipulating the financial records of AMC.
- At the June 7, 1995 AMC board meeting, Dr. Schatz advised the Board that the machinery division of the VGT organization had a cash flow problem, but he never disclosed this fact to Battenfeld.

As described below, however, no reasonable jury could conclude that these individuals negligently failed to disclose their knowledge of the fraudulent scheme or any "cash flow" problems at AMC. Rather, the uncontroverted facts interpreted in the light most favorable to the nonmoving party demonstrate that, if anything, these individuals intentionally withheld information from Battenfeld. Accordingly, summary judgment in favor of the AMC and

FTG/VGT designees is appropriate on BKD's comparative fault designations.

It is beyond dispute that Mssrs. Root and Eigruber purposefully concealed their knowledge of fraudulent conduct and purported "cash flow" problems from Battenfeld. According to Mr. Root's sworn written statements and his deposition testimony, he deliberately concealed AMC's fictitious customers and accounts receivable from Battenfeld. For example, in his March 1999 statement, Mr. Root expressly stated that he "continued to attempt to conceal AMC's fictitious accounts receivable from Battenfeld" after Battenfeld purchased AMC in mid–1995. In the words of Mr. Root, his "concealment process worked as planned" until the 1996 audit of AMC's financial statements. Similarly, Mr. Eigruber's sworn statement reveals that Mr. Eigruber purposefully withheld information from Battenfeld. For example, he stated that he did not tell the Battenfeld representatives about the 1993 Fortilit transaction because he believed that the transaction had been "reversed" in March 1995—before the May 1995 due diligence meeting with Battenfeld and before Battenfeld's subsequent purchase of AMC. Moreover, Mr. Eigruber stated that, after the acquisition, he did not disclose any information about the Fortilit transaction or about AMC's cash flow problems because he was "afraid [he] might lose [his] job." The statements and testimony of both Mr. Root and Mr. Eigruber, if believed, confirm beyond all doubt that these individuals intentionally withheld information from Battenfeld. BKD has failed to direct the court to any evidence in the record that would support a theory of negligence with respect to the acts or omissions of Mssrs. Root or Eigruber.

With respect to Dr. Schatz, the court first notes that Dr. Schatz, in his deposition, vigorously denied having any knowledge of fraudulent activity at AMC prior to 1996. Although Mr. Eigruber advised Dr. Schatz in 1995 about the Fortilit transaction, Dr. Schatz testified that he did not consider the transaction to be fraudulent and that he "reversed" the transaction in 1995. BKD's only evidence, then, that Dr. Schatz had knowledge of prior inventory manipulations of AMC's financial statements is based on the statements of Mr. Eigruber. In his sworn written statement, for example, Mr. Eigruber stated that Dr. Schatz told him that he "knew there were inventory manipulations at TMB, TET and AMC." According to Mr. Eigruber, Dr. Schatz "wanted to fix this problem" but did not fix the problem because "VGT was on the verge of bankruptcy." According to Mr. Eigruber's statement, Dr. Schatz further told him that he had to sell AMC "to get VGT's debt down." Even assuming that Dr. Schatz made these statements (which he denies), the statements clearly demonstrate that any acts or omissions of Dr. Schatz were intentional (*e.g.*, he decided not to fix the inventory manipulation problems because VGT was on the verge of bankruptcy). The purported statements of Dr. Schatz further demonstrate that he purposefully withheld damaging information about AMC from Battenfeld because he did not want to jeopardize the sale of AMC—a sale that he had to make to "get VGT's debt down." Finally, with respect to the June 7, 1995 board meeting, Dr. Schatz's testimony reveals that he did not believe that the machinery division of VGT suffered from a "cash flow" problem. Rather, Dr. Schatz was attempting to give AMC's board of directors a "heads up" that he was thinking about selling AMC. According to Dr. Schatz, he explained to the board that it was not possible to run a successful worldwide machinery division in light of VGT's current cash situation. As a result, he was contemplating selling AMC—the United States presence of VGT's machinery division. Thus, even assuming that Dr. Schatz had a duty to disclose this information about VGT's cash situation to Battenfeld (which the court seriously doubts), the evidence set forth by BKD demonstrates that Dr. Schatz intentionally failed to disclose such information.

With respect to BKD's allegation that Mmes. Clements, McNichols, Ungaro, Dallen and Shadday and that Mssrs. Shober and Bupp *negligently* failed to disclose their involvement in the fraudulent activity, the deposition testimony and/or sworn statements of these individuals clearly indicate that these individuals *intentionally* withheld such information. Ms. Shadday, for example, stated in her sworn written statement that she "decided to keep quite [sic] so I would not lose my job." Ms. Ungaro's sworn written statement reveals that she, too, decided not to disclose her knowledge of the fraudulent activity for fear of losing her job. In the same vein, Mmes. Clements, McNichols and Dallen stated in their sworn statements that they agreed to participate in the fraudulent activity because they feared losing their jobs if they declined. Presumably, then, these individuals failed to report the fraudulent activity to anyone else because they feared losing their jobs.

In short, there is simply no evidence in the record before the court that the acts or omissions of Mr. Root, Mr. Eigruber, Dr. Schatz and the other AMC employees were anything other than intentional. Accordingly, summary judgment in favor of Battenfeld and AMC is appropriate with respect to BKD's attempt to compare its fault to the AMC, FTG and VGT designees. *See Kansas State Bank & Trust Co. v. Specialized Transp. Servs., Inc.,* 249 Kan. 348, 374, 819 P.2d 587 (1991) (the intentional acts of a third party cannot be compared with the negligent acts of a defendant whose duty it is to protect the plaintiff from the intentional acts committed by the third party).

### B. *The Battenfeld/SMS Designees*

BKD also seeks to compare its negligence with the alleged negligence of Battenfeld, SMS Capital Corporation and SMS Finance Corporation (collectively "Battenfeld/SMS"). Specifically, BKD claims that Battenfeld/SMS performed a negligent pre-acquisition due diligence and that Battenfeld/SMS, after the acquisition, negligently failed to review adequately AMC's books, records and reports; negligently failed to monitor and supervise adequately AMC officers and employees; negligently failed to investigate suspicious records and circumstances; and negligently failed to take adequate corrective measures.

### 1. Allegations of Pre–Acquisition Negligence

In its papers and the pretrial order, BKD asserts, in a conclusory fashion, that Battenfeld's due diligence was negligent. BKD offers little evidence or argument, however, with respect to what specific actions or steps Battenfeld should have taken in order to conduct an appropriate due diligence. Moreover, as Battenfeld points out, BKD has failed to come forward with any expert testimony with respect to the standard of care for due diligence in connection with a corporate acquisition. As set forth below, the court concludes that Kansas courts would require BKD to offer expert testimony on the appropriate standard of care for corporations conducting due diligence in the acquisition context. Because BKD fails to offer any expert testimony on this issue, a jury cannot compare Battenfeld's negligence to BKD's negligence. Summary judgment in favor of Battenfeld on BKD's comparative fault designations is warranted. In any event, even assuming that Kansas courts would not require BKD to offer expert testimony on the appropriate standard of care, summary judgment is nonetheless appropriate because BKD has failed to demonstrate that Battenfeld's purported pre-acquisition negligence caused Battenfeld to incur any damages.

 The court first addresses Battenfeld's argument that summary judgment is appropriate because BKD has failed to establish the requisite standard of care for due diligence in the corporate acquisition context through expert testimony or, for that matter, through any testimony. It is well settled under Kansas law that plaintiffs attempting to establish neg-

ligence based upon a departure from the reasonable standard of care in a particular profession must offer expert testimony to establish such a departure. *Moore v. Associated Material & Supply Co.*, 263 Kan. 226, 234–35, 948 P.2d 652 (1997). An exception to this rule is recognized, however, where the lack of reasonable care or the existence of proximate cause is apparent based on common knowledge or experience. *Sterba v. Jay*, 249 Kan. 270, 283, 816 P.2d 379 (1991). Expert conclusions or opinions are not necessary where the normal experience and qualifications of jurors permit them to draw proper conclusions from given facts and circumstances. *Id.*

■ As the Kansas Supreme Court has acknowledged, however, "[h]oldings of an expert testimony requirement outside the area of professional liability, where breach of a standard of care must be proven, are not easily found." *Moore*, 263 Kan. at 235, 948 P.2d 652. In *Moore v. Associated Material & Supply Co.*, the plaintiffs, a group of homeowners, filed suit against the operator of a sand pit adjacent to their property for damages alleged to have been caused during floods. *Id.* at 228, 948 P.2d 652. The plaintiffs claimed that a pile of overburden constructed by Associated Material diverted floodwater onto their property. *Id.* The trial court granted summary judgment to Associated Material based on the plaintiffs' failure to obtain and identify an expert witness to establish causation. *Id.*

On appeal, the Kansas Supreme Court held that expert testimony was not required to prove causation in the case and reversed the trial court's grant of summary judgment. *Id.* at 242, 948 P.2d 652. In reaching its decision, the *Morris* court marshaled the evidence from which a reasonable jury could conclude that Associated Material's overburdened pile affected the surface flow of the water, including the

homeowners' observations, the testimony of Associated Material's own employees and the observations and opinions of a Division of Water Resources (DWR) inspector. *Id.* The record reveals, however, that the DWR inspector had personal experience with and specialized knowledge of the dynamics of floodwaters. *See id.* at 231–32, 948 P.2d 652. The record further reveals that the observations of the homeowners with respect to causation were "self-evident" in nature. *See id.* at 239, 948 P.2d 652 ("Where the causal nature of an action is self-evident, an expert is not required in order to submit a matter for decision to a jury, regardless of the existence of other complicating factors.").

As an initial matter, BKD's attempts to establish Battenfeld's negligence based upon a departure from the standard of care in performing its pre-acquisition due diligence are somewhat analogous to those cases in which a plaintiff attempts to establish negligence in the professional liability context. A jury of lay people has no more common knowledge about complex business practices than it does about the standard of care for accountants or lawyers or physicians. Such a jury is not in a position to determine how much diligence is due without the assistance of someone who has that specialized knowledge—an expert witness. This is certainly the case here where the allegations are based in large part on Battenfeld's purported failure to allow its own accountants to perform a complete audit in accordance with the standards of the accounting profession. The *Morris* case (a case outside the professional liability context) supports this conclusion that expert testimony is required under Kansas law unless the record evidence concerning negligence and causation is "self-evident" or is otherwise established through the testimony of an individual with specialized knowledge or personal experience bearing on the matters at issue.[16] With that framework in mind, BKD

16. There is absolutely nothing in the record indicating that the standard of care for due diligence in a corporate acquisition is "self-evident" such that expert testimony would be unnecessary. While BKD believes that such matters are within the common knowledge and understanding of average jurors, the court disagrees.

has failed to offer testimony from anyone with experience or knowledge of the requisite standard of care for corporations performing due diligence in the acquisition context. The court concludes that Kansas courts would require BKD, in order to permit the jury to compare Battenfeld's purported negligence in performing its due diligence, to come forward with testimony from someone with personal experience or specialized knowledge of due diligence procedures in the corporate acquisition context. *See* Fed.R.Evid. 702 (expert testimony can be based upon "other specialized knowledge"); *accord Kumho Tire Co. v. Carmichael,* —— U.S. ——, ——, 119 S.Ct. 1167, 1176, 143 L.Ed.2d 238 (1999) (recognizing that expert testimony may be based purely on personal experience). In the absence of any such testimony, summary judgment in favor of Battenfeld and AMC on BKD's comparative fault designations is appropriate.

■ Even assuming, however, that Kansas courts would not require expert testimony to support BKD's allegation that Battenfeld negligently performed its pre-acquisition due diligence, BKD has nonetheless failed to demonstrate that Battenfeld's purported pre-acquisition negligence caused Battenfeld to incur any damages. BKD cites only three examples of how Battenfeld should have acted differently in connection with its due diligence. First, BKD highlights that Battenfeld closed on its acquisition of AMC before receiving the final report of its own auditors, Coopers & Lybrand. According to BKD, Battenfeld should have waited to close the deal until after it received Coopers & Lybrand's report. BKD fails to demonstrate, however, that Battenfeld would have avoided its damages (*i.e.,* aborted its plans to purchase AMC) even if it had waited for Coopers & Lybrand's final report prior to closing the deal. First, it is undisputed that Coopers & Lybrand was assigned a limited role in the acquisition audit. Moreover, nothing in the Coopers & Lybrand report reveals AMC's fictitious accounts receivable or fictitious customers. While the report advises Battenfeld to reassess the valuation of potentially uncollectible accounts receivable, there is still no evidence that Battenfeld, had it followed this advice, would have discovered the fraudulent conduct prior to closing on its purchase of AMC.

Second, BKD maintains that Battenfeld's CEO, Dr. Helmut Eschwey, should have asked Dr. Schatz about the fact that AMC's inventory was high and that its receivables had nearly doubled from 1993 to 1994. Again, however, BKD does not provide any evidence that Battenfeld would have discovered the fraud and, thus, avoided its damages had Dr. Eschwey discussed these items with Dr. Schatz. In fact, according to BKD's theory of the case, the evidence demonstrates that any attempts by Dr. Eschwey to discuss these items with Dr. Schatz would not have led to the discovery of the fraud. According to BKD, Dr. Schatz knew about the inventory manipulations at AMC and, nonetheless, failed to take any action to fix the problem because VGT was on the verge of bankruptcy. Along these same lines, BKD contends that Dr. Schatz had to sell AMC in order to reduce VGT's debt. As set forth above, these purported statements of Dr. Schatz demonstrate that he purposefully withheld damaging information about AMC from Battenfeld because he did not want to jeopardize the sale of AMC. Accordingly, any attempts by Dr. Eschwey to obtain additional information from Dr. Schatz about AMC's high inventory or receivables would have been futile in terms of uncovering fraudulent activity at AMC.

Finally, BKD vaguely asserts that Battenfeld should have allowed Coopers & Lybrand to conduct a thorough audit of AMC's financial statements. As an initial matter, it is undisputed that Coopers & Lybrand did not audit AMC's financial statements because BKD was hired to perform that task. Moreover, BKD has not offered any evidence that Coopers & Lybrand would have uncovered the fraud had Battenfeld allowed it to thoroughly audit AMC's financial statements. As Battenfeld

points out in its papers, BKD's failure to come forward with evidence on this issue is perhaps understandable, for any evidence demonstrating that Coopers & Lybrand should have or would have uncovered AMC's fictitious accounts receivables if it had undertaken an audit of AMC's financial statements would most certainly demonstrate that BKD itself was negligent in not uncovering the same fraudulent activity.

### 2. Allegations of Post–Acquisition Negligence

With respect to Battenfeld's conduct after it acquired AMC, BKD suggests only that Battenfeld should have taken action to reduce the amount of AMC's accounts receivable, per the Board's advice on August 21, 1995, and that Battenfeld should have taken action to reassess the valuation of potentially uncollectible accounts receivable, per the advice of Coopers & Lybrand in its final report issued in September 1995. Even assuming, however, that Battenfeld was negligent, BKD has failed to demonstrate that Battenfeld, if it had taken steps to reduce the amount of AMC's accounts receivable, would have uncovered the fraud in time to mitigate its loss.

### VI. AMC's, FTG's and VGT's Motions for Summary Judgment on BKD's Third–Party Complaint

In the pretrial order, BKD asserts several third-party claims against AMC, FTG and VGT, including claims of fraud, fraud by silence, negligent misrepresentation and indemnity in the event that BKD is found liable to Battenfeld.[17] The third-party defendants move for summary judgment on several separate but related grounds. The primary thrust of these motions, however, is premised on the argument that the misconduct of Mr. Root cannot be imputed to any of the corporate third-party defendants and, thus, the corporate entities cannot be liable to BKD for that misconduct. As set forth in more detail below, the court concludes, based on the undisputed facts and on established principles of agency law and tort law, that AMC cannot be held liable for the actions of Mr. Root. AMC's motion for summary judgment is granted. With respect to FTG and VGT, however, the court concludes that genuine issues of material fact exist concerning whether Mr. Root, at the time he engaged in the fraudulent activity, was acting at the direction and control of FTG and VGT. For this reason, FTG's and VGT's motions for summary judgment must be denied with respect to this issue.

### A. Imputing Mr. Root's Conduct to AMC, FTG and VGT

The court begins its analysis with a brief summary of the facts relevant to the motions for summary judgment. Specifically, the court looks to those facts bearing on whether Mr. Root, at the time he was engaged in the fraudulent scheme, was acting adversely to or for the benefit of any of the corporate entities. *Compare Kline v. Multi–Media Cablevision, Inc.,* 233 Kan. 988, 989, 666 P.2d 711 (1983) (a principal is responsible for the torts of its agent where the tortious acts are incidental to and in furtherance of the principal's business, even though outside the scope of the agent's authority) *with Supreme Petroleum, Inc. v. Briggs,* 199 Kan. 669, 675–76, 433 P.2d 373 (Kan.1967) (if the corporation's agent acted adversely to the interests of the corporation, the agent's acts are not imputed to the corporation).

According to Mr. Root's testimony, he created and maintained the fraudulent scheme at AMC at the direction of Reinhard Theysohn and Dr. Ernst Kruger. Mr. Theysohn and Dr. Kruger have denied these allegations. But assuming, for purposes of these motions only, that Mr. Root is telling the truth, the record before the court indicates that Mr. Theysohn and Dr. Kruger, at the time they purportedly in-

---

17. Initially, BKD had asserted a breach of contract claim against AMC in its third-party complaint. BKD has abandoned that claim in the pretrial order and, accordingly, AMC's motion for summary judgment on any breach of contract claim is granted.

structed Mr. Root to engage in fraudulent activity, were acting as agents of FTG/VGT rather than as agents of AMC.

In that regard, Mr. Root consistently and repeatedly testified that Mr. Theysohn and Dr. Kruger directed Mr. Root to take certain actions "for the benefit of the group" and "to pump up the group's profitability." It is undisputed that the Fortilit transaction, for example, was done for the sole benefit of another Theysohn company, TET. The transaction allowed TET to show an increase in its sales for 1993. With respect to the creation of AMC's fictitious customers and related accounts receivable, Mr. Root's testimony indicates that this activity was done for the benefit of the Theysohn group of companies, not for AMC as a stand-alone corporation. For example, according to Mr. Root, when Mr. Theysohn first approached him in 1993 about losses that AMC had suffered that year, Mr. Theysohn was concerned that such losses "would not be beneficial for the group." In 1994, according to Mr. Root, Mr. Theysohn advised Mr. Root that they needed to do something to "protect the group from losses" and that, accordingly, Dr. Kruger would be contacting Mr. Root about "a way to pump up the financial statements of the Theysohn group." Along those same lines, Mr. Root testified that Dr. Kruger advised him in 1994 that they "needed to cover losses of American Maplan and the Theysohn group" and, thus, asked Mr. Root to set up fictitious accounts receivable to "help out the Theysohn group and improve the profitability of the group in general." According to Mr. Root's version of the events, Dr. Kruger "said he'd been instructed by Mr. Theysohn to [create fictitious accounts] to cover the losses of the group." Similar testimony is found throughout both volumes of Mr. Root's deposition.

As set forth above, however, the facts concerning Mr. Root's involvement in the fraudulent scheme are hotly contested. Mr. Theysohn and Dr. Kruger vigorously deny any knowledge of or participation in Mr. Root's activity. Assuming that Mr. Theysohn and Dr. Kruger are telling the truth, the motivations behind Mr. Root's activity are less clear. The record before the court suggests several explanations concerning Mr. Root's decision to artificially inflate the financial standing of AMC. The first explanation is found in Mr. Root's sworn written statement of March 15, 1999. There, Mr. Root sets forth his belief that by covering the losses of the Theysohn group as a whole, he was helping AMC "keep its doors open." Apparently, Mr. Root had some concern that if FTG/VGT suffered losses, those entities might decide to shut down AMC's operations. Another explanation that finds some support in the record is that Mr. Root created the fictitious accounts receivable in order to cover for sums that he was taking from AMC for his own personal benefit. Although Mr. Root testified that these sums were authorized by Mr. Theysohn to supplement Mr. Root's salary, it is undisputed that Mr. Root did obtain certain monies from AMC, that he spent these monies for his own benefit (*e.g.*, he testified that purchased a car, a hot tub for his home, and spent some of the money on food and travel) and that these "additional payments" to Mr. Root were not disclosed to AMC's board. Mr. Theysohn, of course, denies that he authorized any additional payments to Mr. Root.

The record is susceptible to a third interpretation with respect to Mr. Root's conduct. It is possible that Mr. Theysohn and Dr. Kruger expressed concern to Mr. Root about the group suffering losses and the possible ramifications of those losses without actually instructing Mr. Root to "cover" those losses through the creation of fictitious accounts or any other fraudulent means. Nonetheless, Mr. Root may have believed that Mr. Theysohn and Dr. Kruger wanted him to cover those losses and, as a result, acted overzealously in an effort to please his superiors.

Having set forth the three possible sets of circumstances surrounding Mr. Root's conduct (at least the only three factual scenarios supported by the record), the

court turns to apply those facts (and any reasonable inferences drawn therefrom) to the applicable law relating to the issue at hand. In that regard, the court looks first to any Kansas cases addressing the circumstances in which the misconduct of a corporate employee can be imputed to the corporation for purposes of vicarious liability. *See O'Melveny & Myers v. FDIC*, 512 U.S. 79, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994) (recognizing no federal common law of imputation and requiring courts to apply state law).

■ Although the court has found no Kansas cases directly applicable to the facts presented here, the cases reveal some basic principles of agency law that are relevant. In Kansas, a corporation is liable for the torts of its agent when committed within the scope of the agent's authority and course of employment even though it did not authorize or ratify the tortious acts. *Kline v. Multi–Media Cablevision, Inc.*, 233 Kan. 988, 989, 666 P.2d 711 (1983) (citing *Russell v. American Rock Crusher Co.*, 181 Kan. 891, 894, 317 P.2d 847 (1957)). In the same vein, a principal is responsible for the torts of its agent where the tortious acts are incidental to and in furtherance of the principal's business, even though outside the scope of the agent's authority. *Id.* (citing *Williams v. Community Drive–In Theater, Inc.*, 214 Kan. 359, 520 P.2d 1296 (1974)).

■ An exception to this general rule of respondeat superior exists, however. If the corporation's agent acted adversely to the interests of the corporation, the agent's acts are not imputed to the corporation. *Comeau v. Rupp*, 810 F.Supp. 1127, 1139–40 (D.Kan.1992) (citing *Supreme Petroleum, Inc. v. Briggs*, 199 Kan. 669, 675–76, 433 P.2d 373 (Kan.1967) (agent's acts that are adverse to principal's interest are not imputed to principal unless agent is sole representative of principal); *Ryan v. Scovill*, 140 Kan. 588, 590–91, 37 P.2d 1007 (1934)). For this exception to apply, "the conduct and dealing of the agent [must be] such as to raise a clear presumption that he will not communicate

to the principal the facts in controversy, as in a case where the agent, acting nominally as such, is in reality acting in his own business or for his own personal interest and adversely to the interests of the principal or for any reason has a motive or interest in concealing the facts from his principal." *Supreme Petroleum*, 199 Kan. at 675, 433 P.2d 373.

■ AMC urges that the "adverse interest" exception to the general rule of imputation mandates summary judgment in its favor. In support of its motion, AMC relies heavily on *Cenco Inc. v. Seidman & Seidman*, 686 F.2d 449 (7th Cir. 1982), a leading case analyzing the adverse interest exception to the general rule of imputation. In that case, former managers of the defendant corporation had engaged in a massive fraudulent scheme to inflate the corporation's inventories. *See id.* at 451. The immediate effect of this fraud was to provide several benefits to the corporation, at the expense of outsiders such as creditors. *Id.* When the fraud was discovered, certain stockholders sued the corporation, which in turn sued the accounting firm that had audited the corporation and failed to discover the fraud. *Id.* The auditors set up the defense of contributory negligence against the corporation's claims, alleging that the actions and knowledge of the corrupt former managers should be imputed to the corporation. *Id.* at 453–54.

Interpreting Illinois law, the *Cenco* court prefaced its discussion with the assumption that two fundamental objectives of tort liability remained applicable: to compensate the victims of wrongdoing and to deter future wrongdoing. *See id.* at 454–55. The court noted that the stockholders would be the real beneficiaries of a judgment in favor of the corporation, and that such a result would effectively allow the stockholders to benefit from the fraud. *See id.* at 455. As to the goal of deterrence, the court found that allowing the corporation to shift liability to the accountants would reduce the shareholders' in-

centive to hire more honest managers and to monitor their behavior more closely. *See id.* at 455–56. The court summarized the pertinent considerations:

> Fraud on behalf of a corporation is not the same thing as fraud against it. Fraud against the corporation usually hurts just the corporation; the shareholders are the principal if not only victims; their equities vis-a-vis a careless or reckless auditor are therefore strong. But the stockholders of a corporation whose officers commit fraud for the benefit of the corporation are beneficiaries of the fraud. Maybe not net beneficiaries, after the fraud is unmasked and the corporation is sued—that is a question of damages, and is not before us. But the primary costs of a fraud on the corporation's behalf are borne not by the stockholders but by outsiders to the corporation, and the stockholders should not be allowed to escape all responsibility for such a fraud, as they are trying to do in this case.

*See id.* at 456. Because the stockholders were the beneficiaries of the former managers' fraud, the court found no error in an instruction that allowed the jury to impute the fraud to the corporation. *See id.*

Perhaps recognizing that the *Cenco* decision, an effort by the Seventh Circuit to predict Illinois law, is not controlling on this court (and, in any event, is not directly on point), AMC also relies on Judge Belot's decision in *Comeau v. Rupp,* 810 F.Supp. 1127 (D.Kan.1992). In that case, the FDIC brought an action in its corporate capacity as the successor in interest to a failed savings and loan association (S & L). *Id.* at 1137. The FDIC alleged that the lending practices of the majority owners and directors of the S & L caused the S & L to suffer losses on specific loans. *Id.* The FDIC also brought several claims against the S & L's accountants for negligently certifying the S & L's financial statements notwithstanding the accountants' actual or constructive knowledge of the high risk posed by certain participation loans. *Id.* at 1138. The accountants moved for summary judgment, using the imputation doctrine as a defense, on the grounds that the wrongful conduct of the S & L's majority owners and directors should be imputed to the FDIC. *Id.*

After a thorough discussion of the "adverse interest" exception, guided by Kansas law, the *Cenco* decision, and cases applying the exception in the FDIC context, Judge Belot determined that questions of fact existed with respect to whether the S & L's majority owners and directors acted for personal gain or for the purpose, however misguided, of benefiting the S & L. *Id.* at 1141. Nonetheless, Judge Belot ultimately concluded that the accountants could not impute the wrongful conduct of the majority owners to the FDIC, in large part because of the peculiar role of the FDIC in the case. *Id.* at 1142. Specifically, the status of the FDIC in *Comeau* was "more akin to that of a creditor, rather than a stockholder or a voluntary assignee of the association." *Id.* To impute the fraudulent acts of the owners to the FDIC would result in the public paying "for wrongs that it was in no real position to prevent." *Id.*

As this brief review of the relevant case law might suggest, the court has been unable to locate any cases that are directly applicable to the unique set of facts presented here. Nonetheless, the court finds the *Cenco* decision and Judge Belot's *Comeau* decision helpful to the extent those decisions suggest that established principles of tort law should guide a determination of whether an entity should be held liable for the misconduct of its agent under any particular set of circumstances. In *Comeau,* for example, Judge Belot highlighted that imputing fraud to the FDIC "would defeat rather than further the tort principle of compensating the victim, while doing nothing either to deter culpable parties from refraining from tortious conduct, or to encourage the shareholder to employ more trustworthy managers." *Id.* Judge Belot further recognized the inherent inequity in allowing the accountants to shift their liability for losses suffered by the

minority shareholders to an entity that was indisputably without fault in bringing about the S & L's losses. *See id.* Similar principles shape the court's analysis here. In that regard, in determining whether Mr. Root's conduct should be imputed to any of the corporate entities here, the court will focus on whether any of the corporate entities benefitted from Mr. Root's conduct and whether BKD is attempting to shift its liability to an "innocent" corporate entity.

Bearing these principles in mind, the court turns back to the facts of this case. Assuming the truth of Mr. Root's version of events, *i.e.,* that Mr. Theysohn and Dr. Kruger ordered him to cover the group's losses by creating fictitious customers and accounts receivable, the evidence demonstrates that Mr. Root's scheme was intended to benefit the entire group of Theysohn companies rather than AMC as a separate entity. Ample evidence in the record supports the conclusion that Mr. Theysohn and Dr. Kruger were concerned with the overall financial picture of the Theysohn companies and that the financial statements of the Theysohn companies were consolidated. In contrast, the record is devoid of any evidence from which a reasonable jury could conclude that Mr. Theysohn and Dr. Kruger recruited Mr. Root to paint an artificial picture of AMC's financial situation for the benefit of AMC as a separate entity. To the extent the scheme made AMC more attractive to potential buyers such as Battenfeld, the scheme (at least in the short term) benefitted AMC's shareholder, FTG. In short, if the facts as described by Mr. Root are true, then AMC had the unfortunate luck of having an agent, Mr. Root, acting for the benefit of another corporation and adversely to it. AMC should not be held responsible for Mr. Root's conduct. With respect to FTG and VGT, however, a reasonable jury could conclude, based on the record evidence, that Mr. Root conducted the fraudulent scheme at the direction of Mr. Theysohn and Dr. Kruger, who were acting as agents of FTG and VGT when they directed Mr. Root's activities. For this reason, summary judgment in favor of FTG and VGT must be denied.

■ With respect to AMC, however, even if the evidence at trial demonstrates that Mr. Root was acting not on the instructions of Mr. Theysohn or Dr. Kruger but rather on his own accord in an effort to "save" AMC from what Mr. Root perceived as an inevitable demise at the hands of FTG/VGT, this conduct is nonetheless adverse to AMC. Assuming that FTG/VGT was planning to close AMC, Mr. Root's plan to artificially inflate AMC's financial statements did not benefit AMC in a legal sense. *See, e.g., Schacht v. Brown,* 711 F.2d 1343, 1347–49 (7th Cir.1983) (conduct of former officers not attributable to corporation where fraud artificially prolonged corporation's existence past insolvency); *In re Investors Funding Corp.,* 523 F.Supp. 533, 541 (S.D.N.Y.1980) ("A corporation is not a biological entity for which it can be presumed that any act which extends its existence is beneficial to it."). Moreover, assuming Mr. Root was acting on his own accord, he painted a false financial picture for AMC's shareholder, FTG, and its officers. As a result, AMC's shareholder and its officers could not make informed decisions about the business of AMC. Thus, under all possible scenarios, Mr. Root acted adversely to the interest of AMC. No evidence in the record before the court suggests otherwise. Applying the adverse interest exception under Kansas law, Mr. Root's conduct cannot be imputed to AMC.

This result is consistent with what the *Cenco* court and Judge Belot recognized as the objectives of tort law most salient for these purposes. It will fix liability for any loss on those responsible and not shift the loss for all practical purposes to the victim of the wrongdoing, the present shareholder of AMC who, like the FDIC in *Comeau,* may be viewed more like a creditor than one who would otherwise stand to benefit from the conduct in question. Moreover, it is not inimical to the deterrence factor, because it is not the present shareholder

of AMC who hired Mr. Root instead of a more honest manager—it was those who would have stood to benefit had the alleged scheme been successful. For the foregoing reasons, AMC's motion for summary judgment is granted.

### B. FTG and VGT's Remaining Arguments

 FTG and VGT also highlight additional reasons that they are entitled to summary judgment on BKD's claims. With respect to BKD's fraud claims, FTG and VGT maintain that the evidence set forth by BKD in support of its claims— primarily Mr. Root's testimony—is not "clear and convincing" as required by Kansas law. *See Miller v. Sloan, Listrom, Eisenbarth, Sloan & Glassman,* 267 Kan. 245, 978 P.2d 922, 932 (1999) (fraud by silence claim must be established through clear and convincing evidence); *Waxse v. Reserve Life Ins. Co.,* 248 Kan. 582, 586, 809 P.2d 533 (1991) ("Fraud is never presumed and must be shown by clear and convincing evidence."). In that regard, FTG and VGT contend that Mr. Root's testimony is "vague and unsubstantiated" and that Mr. Root admitted to making deliberate falsehoods in his sworn written statements. The court disagrees and FTG's and VGT's motions for summary judgment on these grounds are denied. Evidence is clear if it is certain, unambiguous, and plain to the understanding, and is convincing if it is reasonable and persuasive enough to cause the trier of fact to believe it. *See Ortega v. IBP, Inc.,* 255 Kan. 513, 528, 874 P.2d 1188 (1994) (citing *Chandler v. Central Oil Corp.,* 253 Kan. 50, 58, 853 P.2d 649 (1993)). The written statements and deposition testimony of Mr. Root in the record on summary judgment meets this test. FTG and VGT, in essence, are asking the court to assess Mr. Root's credibility. This task is for a jury. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict.").

FTG and VGT also move for summary judgment on BKD's claim for indemnity. According to FTG and VGT, only those parties "without fault" are entitled to seek indemnification. In support of their argument, FTG and VGT rely on the following excerpt from an opinion of this District:

> There are two traditional situations in which claims of indemnity are allowed. The first occurs where there is an expressed contract of indemnity, such as a "hold harmless" agreement. The second occurs where a contract of indemnity may be implied when one is compelled to pay what another party ought to pay. The implied or constructive liability usually arises when one personally, without fault, is made to pay for a tortious act of another. The person paying has a right of action against the person at fault.

*Edward Kraemer & Sons, Inc. v. City of Kansas City,* 874 F.Supp. 332, 335 (D.Kan. 1995) (quoting *Haysville U.S.D. No. 261 v. GAF Corp.,* 233 Kan. 635, 642, 666 P.2d 192 (1983)). The court is uncertain whether BKD is attempting to assert a substantive claim for "indemnity" or indemnification in the contractual sense (as described in the *Haysville* decision) or whether BKD is simply using the term "indemnity" as a short-hand description for the procedural basis of its substantive third-party claims for fraud, fraud by silence and negligent misrepresentation. To the extent BKD is attempting to assert an independent, substantive claim for "indemnity" against FTG and VGT, FTG's and VGT's motions for summary · judgment are granted. There is no evidence of any basis for contractual indemnification, implied or otherwise, on which BKD could assert such a claim. To the extent, however, that BKD is simply using the term "indemnity" to describe the procedural mechanism for the assertion of its substantive third-party claims, FTG's and VGT's motions for summary judgment are denied.

■ Finally, FTG and VGT move for summary judgment with respect to BKD's claim for negligent misrepresentation. Essentially, FTG and VGT argue that fraudulent misrepresentation, if anything, is the only applicable theory of recovery. The court agrees. As set forth above, FTG and VGT may ultimately be held liable to BKD for the conduct of Mr. Root. No reasonable jury could conclude, however, based on the record before the court, that Mr. Root acted negligently. As described above in connection with the court's analysis of BKD's comparative fault designations, the record is devoid of any evidence suggesting that Mr. Root's acts or omissions were anything other than intentional. Accordingly, FTG and VGT's motions for summary judgment are granted with respect to BKD's negligent misrepresentation claims.

## VII. The Individual Third–Party Defendants' Motions for Summary Judgment

■ BKD asserts several third-party claims against Reinhard Theysohn, Ernst Kruger and Horst Eibruber, including claims for fraud, fraud by silence, negligent misrepresentation and indemnity. Each of these individuals moves for summary judgment on BKD's third-party claims.[18] As an initial matter, Dr. Kruger and Mr. Theysohn move for summary judgment on BKD's comparative fault designations. For the reasons set forth above in connection with the court's analysis of those designations, the motions for summary judgment are granted on this issue. Like the motions of FTG and VGT, the primary argument advanced in the motions of Dr. Kruger and Mr. Theysohn is that they cannot be held liable for the actions of Mr. Root. As set forth above in connection with FTG's and VGT's motions for summary judgment, however, a reasonable jury could conclude from the evidence set forth by BKD that Mr. Theysohn and Dr. Kruger instructed Mr. Root to engage in certain fraudulent acts and, moreover, that Mr. Theysohn and Dr. Kruger were acting as agents of FTG and VGT when they directed Mr. Root's activity. Under Kansas law, "a corporate officer or director acting on behalf of a corporation is personally liable for damages caused by his willful participation in acts of fraud or deceit to one directly injured thereby." *See Lentz Plumbing Co. v. Fee,* 235 Kan. 266, 270, 679 P.2d 736 (1984) (citing *Amoco Chemicals Corp. v. Bach,* 222 Kan. 589, 567 P.2d 1337 (1977)). The motions of Dr. Kruger and Mr. Theysohn are denied with respect to this issue. Finally, Mr. Theysohn argues that summary judgment is appropriate because BKD's evidence of fraud is not of a "clear and convincing nature" as required by Kansas law. Like FTG and VGT, Mr. Theysohn contends that Mr. Root's testimony is too vague and incredible to support a verdict in BKD's favor. As set forth above, the court finds that Mr. Root's testimony passes the clear and convincing test and any assessment of Mr. Root's credibility is for the jury to make. Mr. Theysohn's motion for summary judgment on this basis is denied.

**IT IS THEREFORE ORDERED BY THE COURT THAT** BKD's motion for summary judgment based on K.S.A. § 1–402 (doc. # 384) is **granted in part and denied in part.** Specifically, the motion is granted with respect to SMS Finance Corporation and denied with respect to plaintiffs Battenfeld and SMS Capital Corporation. Accordingly, the claims of SMS Finance Corporation are dismissed. BKD's motion for summary judgment against Battenfeld and on Counts III–V of AMC's amended counterclaim (doc. # 388) is **granted in part and deferred in part.** Specifically, the motion is granted with respect to Battenfeld's breach of contract

18. Although Mr. Eigruber has filed a motion for summary judgment, he has not filed a supporting memorandum. Rather, his motion simply "adopts by reference all statements of uncontroverted fact, arguments and authority included in the summary judgment motions made by the third-party defendants AMC, FTG, VGT, Ernst Kruger and Reinhard Theysohn."

claim and Counts III–V of AMC's amended counterclaim. These claims are dismissed. The court defers ruling on the motion to the extent it raises evidentiary issues (*i.e.*, whether Battenfeld's evidence with respect to its alleged damages is competent) that will be addressed in connection with the *Kumho* hearing scheduled later this month. Battenfeld/SMS and AMC's motion for summary judgment on BKD's comparative fault designations (doc. # 400) is **granted** in its entirety and, accordingly, BKD's comparative fault designations are dismissed. AMC's motion for summary judgment on BKD's fourth amended third-party complaint (doc. # 404) is **granted** in its entirety and, accordingly, BKD's third-party complaint is dismissed as to third-party defendant AMC. Third-party defendant VGT AG's motion for summary judgment (doc. # 393) and third-party defendant Friedrich Theysohn GmbH's motion for summary judgment (doc. # 395) are **granted in part and denied in part**. The motions are granted with respect to BKD's negligent misrepresentation claims, granted to the extent that BKD is attempting to assert an independent, substantive claim for "indemnity," and are otherwise denied. The motions of third-party defendants Ernst Kruger (doc. # 383), Reinhard Theysohn (doc. # 398) and Horst Eigruber (doc. # 406) are **granted in part and denied in part**. Specifically, the motions are granted with respect to BKD's comparative fault allegations and are otherwise denied.

IT IS SO ORDERED.