United States Court of Appeals,

Fifth Circuit.

No. 91–2568.

Gary M. BECKER, Plaintiff–Appellant,

v.

PAINEWEBBER, INC., Defendant–Appellee.

June 10, 1992.

Appeal from the United States District Court for the Southern District of Texas.

Before SNEED[*], REAVLEY, and BARKSDALE, Circuit Judges.


SNEED, Circuit Judge:

Appellant Gary Becker appeals from the trial court's decision entering a directed verdict in favor of the appellee, PaineWebber, on a claim of negligent misrepresentation. We affirm.


I.

FACTS AND PROCEEDINGS BELOW

In 1987, Gary Becker, who formerly worked in the crude oil trading business at Mosley Securities, began discussions with various securities firms about creating a crude oil trading unit. In August of that year, he went to New York to meet with PaineWebber representatives. According to the trial testimony of one of these representatives, Becker described the proposed oil trading venture as being relatively low-risk and requiring little capital. After additional meetings, PaineWebber told Becker that his proposal would be submitted to its expense management committee (the "EMC") for approval in September and that no one else needed to approve the plan.

PaineWebber informed Becker in late September that the plan had been approved by the EMC, which anticipated start-up costs of $500,000, including Becker's compensation, rent, and

[*]Senior Circuit Judge of the Ninth Circuit, sitting by designation.

communication expenses. In October, Becker accepted employment with PaineWebber, halted negotiations with other firms, and moved to New York. According to an employment agreement between the parties, Becker would receive an income for one year but none of the profits.

PaineWebber maintains that some months after the EMC approved the plan, it discovered that, because of the large amounts which would be traded, a parent company guarantee and a separate subsidiary would be needed for Becker's proposed oil trading business. This made board approval a requirement.[1] PaineWebber told Becker to compute the amount of the parent company guarantee he believed he needed, and his prediction was $750 million. Becker claims that he was assured repeatedly that board approval was a formality, "a rubber stamp," and that his proposed oil trading unit was a "done deal." He maintains that he was told to advise his clients that the unit was delayed temporarily.

After reviewing Becker's proposal, PaineWebber's Chairman of the Board returned it for revisions. Becker's amended proposal called for a $100 million guarantee. Richard Falk, a PaineWebber executive, testified that the drastic reduction from $750 million made him skeptical of Becker's knowledge of the oil trading business. Becker claims that although PaineWebber's Chief Financial Officer informed Falk in a memo that the proposal had been withdrawn, this news was not relayed to him. Becker maintains he was assured that the project was on schedule and soon would be ready for trading. He alleges that he did not learn of the proposal's defeat until September 1988.

One year after his starting date, Becker was terminated. He received a $120,000 salary and an $173,000 bonus, which was later raised to $230,000. Becker claims that PaineWebber caused him to lose credibility in the oil trading business and that this loss of credibility prevents him from finding employment in the industry. PaineWebber maintains that Becker was terminated because he

---

[1]At PaineWebber, the board of directors must approve any major company decision; the EMC makes decisions involving lesser risk or capital.

conducted an unauthorized oil trade.

Becker brought an action in a Texas state district court for negligent misrepresentation under the Restatement (Second) of Torts § 552, as adopted in Texas, alleging damages in excess of $11 million. PaineWebber removed the action to federal court on the basis of complete diversity of citizenship.[2] Thirteen months after removing the case, PaineWebber sought leave to file an amended answer in the district court and provided two affirmative defenses: (1) New York law applied; (2) the employment-at-will rule barred Becker's claim. The district court denied PaineWebber's motion but granted leave to amend the Joint Pretrial Order. PaineWebber then added the above-mentioned defenses as well as these two: (1) the statute of frauds barred Becker's claim; and (2) Becker was not entitled to damages under the Restatement (Second) of Torts § 552.

A jury trial began on April 1, 1991. At the conclusion of the evidence, PaineWebber moved for a directed verdict, which was granted by the district court on April 4th. The court entered its Final Order on April 11, 1991. This appeal followed.

II.

JURISDICTION AND STANDARDS OF REVIEW

This court has jurisdiction under 28 U.S.C. § 1291 (1988).

A district court's award of a directed verdict is reviewed de novo. *Lloyd v. John Deere Co.,* 922 F.2d 1192, 1194 (5th Cir.1991). In ruling on a motion for directed verdict, a court must examine the entire record in the light most favorable to the nonmovant and draw all inferences in that party's favor. *Treadaway v. Societe Anonyme Louis–Dreyfus,* 894 F.2d 161, 164 (5th Cir.1990). The standard of review on appeal is the same standard used by the trial court. *Springborn v. American Commercial Barge Lines, Inc.,* 767 F.2d 89, 94 (5th Cir.1985). A directed verdict is appropriate

---

[2]Becker remained a Texas citizen while employed by PaineWebber.

only when the facts and inferences point so strongly in the movant's favor that no reasonable jury could reach a contrary conclusion. *See* Fed.R.Civ.P. 50(a); *Brady v. Southern R.R.,* 320 U.S. 476, 479–80, 64 S.Ct. 232, 234–35, 88 L.Ed. 239 (1943).

## III.

## DISCUSSION

A. *Choice of Law*

We first must decide whether to apply the substantive law of Texas or New York. Although both the Texas and New York law of negligent misrepresentation are based on the Restatement (Second) of Torts § 552, PaineWebber maintains that Texas's version is more favorable to Becker's case. PaineWebber argues that under Texas choice of law principles, New York substantive law should apply to this dispute. While we perceive no material difference to warrant PaineWebber's contention that Texas law is more favorable to Becker, we agree that an application of New York substantive law is appropriate and apply it on that basis.

Under *Erie,* a federal court sitting in diversity must apply the choice-of-law rules of the jurisdiction in which it sits. *See Klaxon Co. v. Stentor Elec. Mfg. Co., Inc.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). Texas uses the "most significant relationship" test to determine the applicable law in contract and tort cases. *Duncan v. Cessna Aircraft Co.,* 665 S.W.2d 414, 421 (Tex.1984). Under that test, we have held that the law of the place of employment governs. *See Pruitt v. Levi Strauss & Co.,* 932 F.2d 458 (5th Cir.1991); *Randall v. Arabian Am. Oil Co.,* 778 F.2d 1146 (5th Cir.1985).

Becker received his job offer in New York and moved there immediately. All discussions regarding his proposed oil trading unit occurred in New York, with the exception of some telephone conversations when Becker was still in Texas. During his one-year employment term, Becker remained in New York and maintained an apartment. Therefore, under the "significant relationship"

test, we find that New York substantive law applies to this dispute.

B. *Negligent Misrepresentation*

New York recognizes a cause of action for negligent misrepresentation as set forth in section 552 of the Restatement (Second) of Torts.[3]  *See Mallis v. Bankers Trust Co.,* 615 F.2d 68, 81–82 (2d Cir.1980), *cert. denied,* 449 U.S. 1123, 101 S.Ct. 938, 67 L.Ed.2d 109 (1981);  *Ultramares Corp. v. Touche, Nevin, & Co.,* 255 N.Y. 170, 174 N.E. 441 (1931);  *International Products Co. v. Erie R.R.,* 244 N.Y. 331, 155 N.E. 662 (1927), *cert. denied,* 275 U.S. 527, 48 S.Ct. 20, 72 L.Ed. 408 (1927);  *Glanzer v. Shepard,* 233 N.Y. 236, 135 N.E. 275 (1922).  The elements of negligent misrepresentation are:  (1) a careless statement containing false information made by someone, such as an employer, with a special relationship with the recipient;  (2) the recipient's justifiable reliance on the information;  (3) injury proximately caused by the recipient's reliance on the information. *Mallis,* 615 F.2d at 82.

Becker provided evidence to present a jury question on the first element because he showed that he had a special relationship with PaineWebber, his employer, and that PaineWebber constantly reassured him that his oil trading proposal would be approved when, in fact, PaineWebber knew that approval was becoming increasingly unlikely.  These reassurances could have had their origin in carelessness, a deliberate intent to mislead Becker, or in an effort to prevent discouragement on the part of Becker.  Whatever the true source, a reasonable jury could have found the presence of a negligent misrepresentation.  It would have been error to direct a verdict on the sole ground that no

---

[3]This section provides in pertinent part:

> (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Restatement (Second) of Torts § 552 (1977).

negligent representation was made.

Before turning to the appropriate ground on which the directed verdict rested, it is proper to point out that Becker never sought to establish that PaineWebber promised to create an oil trading unit to be operated by him. Had he done so he would have sought a recovery measured by the benefit of his bargain, i.e. the monetary equivalent to him of the promised trading unit. Instead he seeks only such damages as would be necessary to compensate him "for the pecuniary loss to him of which the misrepresentation is a legal cause."[4]

It is here that Becker failed to establish his case sufficiently to entitle him to get to the jury. His failure was that he established neither his losses in reliance nor any link between the amounts he sought to recover and the alleged negligent representation. We reach this conclusion for the following reasons.

First, Becker's claims are in no way based upon any losses incurred in the year in which he was associated with PaineWebber. He was compensated generously for that year.[5]

---

[4]Restatement (Second) of Torts; section 552B. That section provides:

> (1) The damages recoverable for a negligent misrepresentation are those necessary to compensate the plaintiff for the pecuniary loss to him of which the misrepresentation is a legal cause, including
>
> > (a) the difference between the value of what he has received in the transaction and its purchase price or other value given for it; and
> >
> > (b) pecuniary loss suffered otherwise as a consequence of the plaintiff's reliance upon the misrepresentation.
>
> (2) The damages recoverable for a negligent misrepresentation do not include the benefit of the plaintiff's contract with the defendant.

Restatement (Second) of Torts § 552B (1977).

[5]He was paid a total of $350,000.

Second, Becker does claim to have lost $1.4 million annually by reason of not becoming an oil trader. This figure suggests a contractual recovery more than losses in reliance recovery. To the thousands of law students who were introduced to contract law by studying the case of *Hawkins v. McGee,* 84 N.H. 114, 146 A. 641 (1929), Becker will appear to be using $1.4 million as the measure of damages that will give him the "perfect hand" the doctor in that case promised to provide. That, as the professor repeated over and over, was the contractual measure of damages.

Quite properly, subsection (2) of section 552B of the Restatement (Second) of Torts expressly prohibits a recovery of the "benefit of the plaintiff's contract with the defendant." That is, Becker's reliance on "negligent misrepresentation" limits his recovery when expressed in terms of *Hawkins v. McGee, supra,* to the difference between the hand before the doctor operated and the hand he was left with after the doctor had bungled the operation. This distinction Becker does not seem to have understood.

Third, even assuming that the above characterization falsely represents Becker's intent in pleading $1.4 million and that it is a sum that Becker puts forward as true losses in reliance and not the benefit of his supposed bargain, the amount is not supported by his evidence. His annual earnings during the four years preceding his employment was only $300,000.[6] Moreover, during the three months of trading for PaineWebber losses in the amount of $526,000 were incurred.[7] It is unreasonable to believe that in the light of these figures Becker would have earned $1.4 million annually even if PaineWebber had proceeded with its plans.

Fourth, Becker failed to show that he could have earned the $1.4 million or any lesser figure by becoming an oil trader for another firm had not PaineWebber failed to carry out its original plans.

---

[6]In his past three jobs he received annual salaries averaging about $70,000. Even according to Becker's estimates, his income averaged almost $300,000 annually during the four years prior to his employment at PaineWebber.

[7]He lost $55,000 in April, $10,000 in June, and $451,000 in July.

It is true that a "lost opportunity" can be a basis for damages in a negligent misrepresentation action. *See Nassau Trust Co. v. Montrose Concrete Prod. Corp.,* 56 N.Y.2d 175, 451 N.Y.S.2d 663, 436 N.E.2d 1265, 1269 (1982). Once more Becker only asserts that he could have earned $1.4 million; he offers no substantial proof. The figure is no more persuasive in this setting than it was when considered as proof of what Becker would have earned as an oil trader at PaineWebber.

These conclusions make it unnecessary to reach PaineWebber's employment at will argument or the statute of frauds issue.

The district court did not err in directing a verdict against Becker.

AFFIRMED.