IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

No. 99-60330

---

VALERIE DAVIS, as Administratrix of the Estate of
Pearl Norwood and as Personal Representative of
the Wrongful Death Beneficiaries of Pearl Norwood,
Deceased,

Plaintiff-Appellant,

versus

DALE NORRIS, MD; PARACELSUS SENATOBIA COMMUNITY
HOSPITAL, INC.,

Defendants-Appellees.

---

Appeal from the United States District Court
for the Northern District of Mississippi
2:96-CV-175-B-B

---

May 30, 2000

Before KING, Chief Judge, GARWOOD and DeMOSS, Circuit Judges.

GARWOOD, Circuit Judge:[*]

In this medical malpractice action, plaintiff-appellant Valerie Davis (Davis), as administratrix of the Estate of Pearl Norwood (Norwood) and as personal representative of the wrongful death beneficiaries of Norwood, appeals the district court's grant of directed verdict in favor of defendants-appellees Dale Norris, M.D. (Dr. Norris),

---

[*] Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

and Paraclesus Senatobia Community Hospital, Inc. (Senatobia) (collectively, the Defendants).  We reverse and remand.

## Facts and Proceedings Below

On April 16, 1995, at approximately 10:00 p.m., Norwood, a seventy-nine year-old woman, was involved in an automobile accident.  An ambulance transported Norwood to Senatobia, in Senatobia, Mississippi, for emergency care, and she was admitted to the emergency room, where she was examined by Dr. Norris who was the emergency room physician on duty that evening.

Although Norwood was bleeding from a three-centimeter laceration above her left eyebrow, she appeared alert, oriented, and without labored respiration or other physical distress.  However, she did complain of pain in her right rib cage area. To aid in diagnosing Norwood, Dr. Norris ordered the following tests: a skull x-ray, a cervical-spine x-ray, a chest x-ray with right rib detail, an alcohol level test, a complete blood count, and a pulse-oximeter (which measures the amount of oxygen in the blood).  After reviewing the results of these tests, Dr. Norris diagnosed Norwood with a fracture at her T-6 vertebrate, a fracture in her right rib cage, and a questionable fracture at her C-3 vertebrate in her neck. Dr. Norris did not order an echocardiogram or a CT scan.  In fact, such tests were not available at Senatobia at the time, as only an x-ray technician was on duty during the evenings.

Norwood remained in the emergency room for approximately one hour

and forty minutes. Dr. Norris then transferred her to the medical-surgery floor for twenty-three hour observation. At this time, she was alert and in stable condition with a normal blood pressure, respiration, and pulse. Upon her transfer to the medical-surgery floor, Dr. Parekh took over her treatment.

At approximately 6:10 a.m. on April 17, a nurse observed that Norwood had coughed up blood-tinged sputum. Over the next one-and-a-half hours, Norwood's condition deteriorated. She became unresponsive and her vital signs were unstable. After evaluating Norwood, Dr. Parekh contacted the Regional Medical Center (RMC), a level-one trauma center in Memphis, Tennessee, and requested that Norwood be transferred there. The RMC accepted the transfer, and Norwood was airlifted to the RMC for treatment.

At the RMC, a battery of tests revealed that Norwood suffered from a chip fracture in her C-3 vertebrate, a broken left rib, a broken nose, a fractured sub-bulbar area on the left, a fractured medial orbital wall, a pulmonary contusion, left adrenal hemorrhage, a fracture of the right pubic ramus, and a large ventricular septal defect. Her ventricular septum defect is a congenital heart defect resulting in a small hole between the two lower chambers of the heart. Despite the efforts of the medical personnel at the RMC, Norwood died on the morning of April 18 as a result of myocardial infarction, or a heart attack.

Davis, on behalf of Norwood's estate and Norwood's wrongful death beneficiaries, filed suit against Dr. Norris, Dr. Parekh, and Senatobia

3

in federal district court, alleging that Norwood died as a result of a lack of adequate medical care by Dr. Norris, Dr. Parekh, and the staff at Senatobia. Specifically, Davis claimed that if Norwood had been transferred to the RMC earlier than she was, then she would not have died.

Jurisdiction was based on a federal question raised by Davis–an allegation that the failure to transfer Norwood to a facility with a higher level of care violated the Emergency Treatment and Active Labor Act (ETALA), 42 U.S.C. § 1395dd. The district court later dismissed the ETALA claim with prejudice, but retained the state law claims under supplemental jurisdiction. *See* 28 U.S.C. § 1367. Dr. Parekh was later dismissed as a defendant in the action, and Davis's Mississippi law medical malpractice claims against Dr. Norris and Senatobia proceeded to trial in April 1999. At trial, Davis's expert, James P. Coleman, II, M.D. (Dr. Coleman), testified that the level of care provided by Dr. Norris did not meet the appropriate standard. Dr. Coleman stated that Dr. Norris should have transferred Norwood to the RMC for her to receive a more thorough battery of tests. These tests, Dr. Coleman declared, would likely have detected her heart malady in time for her to be saved. At the close of Davis's case in chief, the district court granted the Defendants' motion for judgment as a matter of law. Davis now appeals.

## Discussion

We review a directed verdict *de novo*, applying the same standard

4

as the district court. *See Becker v. PaineWebber, Inc.*, 962 F.2d 524, 526 (5th Cir. 1992). Accordingly, we view the facts, and any reasonable inferences that may drawn therefrom, in the light most favorable to the non-movant, in this case, Davis. *See Enlow v. Tishomingo County, Miss.*, 45 F.3d 885, 888 (5th Cir. 1995) (*per curiam*). "If the facts and inferences point so strongly and overwhelmingly in favor of one party, such that reasonable men could not arrive at a contrary verdict, the the motion should be granted." *Id*. (citing *Boeing Co. v. Shipman*, 411 F.2d 365, 374 (5th Cir. 1969) (*en banc*)). "On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury." *Boeing*, 411 F.2d at 374. However, a mere scintilla of evidence is insufficient to present a question for the jury. *See Enlow*, 45 F.3d at 888.

Although the record does not contain the Defendants' motion for directed verdict, the district court's written order, or a transcript of the oral proceedings concerning the directed verdict, the parties concede that whether the grant of directed verdict, as to both Dr. Norris and Senatobia, is appropriate depends upon whether Dr. Coleman's testimony establishes a fact question as to whether Dr. Norris committed medical malpractice. Under Mississippi law, to establish a fact question for the jury, Davis must present evidence that Dr. Norris breached his duty to provide the appropriate standard of care and that

5

the breach proximately caused the death of Norwood.  *See Palmer v. Biloxi Reg'l Med. Ctr., Inc.*, 564 So.2d 1346, 1355 (Miss. 1990).  Davis contends that Dr. Coleman's testimony creates such a fact question.  We agree.

The district court admitted, without objection by the Defendants, Dr. Coleman as a medical expert.  Dr. Coleman testified that a competent emergency room physician would have decided that Norwood's condition required testing and monitoring not available at Senatobia and would have sought a transfer directly from the emergency room to a higher-level facility rather than to the Senatobia "floor."  Dr. Coleman further testified that Norwood would have survived if she had been transferred directly from the emergency room and that the responsibility for transferring Norwood rested with her emergency room physician, Dr. Norris.

The Defendants raise several points regarding Dr. Coleman's testimony.  None of them, however, is conclusive and therefore fails to constitute grounds for judgment as a matter of law.  The Defendants rely primarily on Dr. Coleman's testimony about the willingness of another facility to accept a transfer.[1]  If another higher-level facility would

---

[1]    Dr. Coleman testified as follows:

"Q:  What basis again, do you have for saying that he [Dr. Norris] needed to transfer this lady [Norwood] to a higher level facility?

A:    Elderly female with apparent co-existing medical conditions who had a significant blunt force trauma applied with injuries to her forehead, C-spine and chest, it should

6

not have accepted the transfer of Norwood, then any alleged failure on the part of Dr. Norris to seek a transfer could not have caused her death. The Defendants rely on a hypothetical posed to Dr. Coleman on cross-examination concerning the transfer of a female patient with stable vital signs, a fractured rib and neck, and a laceration. However, this hypothetical did not include all the factors that Dr. Coleman stated warranted a transfer of Norwood: an elderly patient with co-existing medical problems who had suffered a blunt force trauma indicating the possibility of other injuries for which Senatobia was not equipped. Therefore, the hypothetical failed to track these factors and does not constitute conclusive evidence that a transfer would have been rejected.

The Defendants also rely on Dr. Coleman's testimony that Norwood

---

be indicative of possible other injuries.

Q: So we call up the doctor at the other facility–

A: Uh-huh.

Q: And we say that we have a lady that is stable, has normal blood pressure, has normal respirations, who was alert and responsive and she has a cut over her left eye, she has a fractured rib and a possible fracture in her neck, and I want to transfer her to your facility.

A: Would she be rejected the way you described it just then?

Q: I'm sorry?

A: If it were described as you said, yes, I would probably have to say, '*Well, why don't you keep her there?*' having not recognized anything else being wrong with her and describing her like that."

7

should have been transferred when the nurse discovered blood tinged sputum the morning of April 17. The Defendants correctly point out that this discovery did not occur until several hours after Norwood had been transferred to the care of Dr. Parekh. However, Dr. Coleman did not state that transfer was not indicated until this discovery, and his testimony in this respect does not render unreliable as a matter of law his opinion that Dr. Norris should have transferred Norwood to a higher level facility rather than admit her to Senatobia.[2]

_____

[2] Dr. Coleman's testimony on this point states as follows:

"Q: And what is your opinion about the approximate cause of Ms. Norwood's death?

A: There's a failure to recognize evolving emergency, also failing to communicate the changes of the patient and also failure to just facilitate a transfer to a patient [sic] to higher level of care.

Q: And is that stated to a reasonable degree of medical certainty?

A: Yes.

Q: And who failed to do those things?

A: I think initially the mechanism of injury in the emergency department, along with the pattern of injury was underestimated.
    I think that once the patient got to the floor and coughed up the blood, at that point her blood pressure was still somewhat labile, I think had that been recognized as a significant lung injury in combination with the decreasing hematocrit, which would have represented bleeding, she would have still had time to be transferred to a higher level of care even at that late time and probably almost certainly would have survived the encounter.

Q: And whose responsibility was it to effect this transfer to a higher level of care facility?

8

The Defendants raise a final point regarding Norwood's treatment, namely, that her ventricular septal defect was only discovered after the consultation of eight specialists at the RMC. This fact concerns whether Dr. Norris was negligent in failing to diagnose the condition himself, not whether he should have transferred Norwood to a higher level facility. Moreover, Dr. Coleman did not testify that Dr. Norris was negligent for failing to make this diagnosis in the emergency room; rather, Dr. Coleman only found fault with Dr. Norris's failure to order a transfer.

To be sure, Dr. Coleman's testimony contains some inconsistencies and ambiguities which weaken the evidence of negligence on the part of Dr. Norris; however, any shortcomings in Dr. Coleman's testimony remain a matter for the jury to weigh in determining the credibility of his opinion. Therefore, we conclude that the district court erred in granting a directed verdict in favor of Dr. Norris.[3]

**Conclusion**

---

A: I believe it rested both with the initial evaluation by Dr. Norris and also by the nursing staff once the blood was seen and documented."

[3]With regard to the directed verdict granted in favor of Senatobia, counsel for the Defendants conceded at oral argument that Senatobia would be vicariously liable for the malpractice, if any, committed by Dr. Norris, and that the case was tried on that basis and assumption. *See Hardy v. Brantley*, 471 So. 2d 358, 371 (Miss. 1985) ( en banc). Senatobia does not contend, nor does the evidence suggest, that the exception to the general rule of vicarious liability on the part of a hospital applies in this case. Nor does Senatobia contend that it was entitled to judgment as a matter of law even if Dr. Norris was not. Therefore, as we reverse the directed verdict granted in favor of Dr. Norris, we also reverse as to Senatobia.

9

For the reasons stated, we reverse the district court's grant of directed verdict in favor of the Defendants Dr. Norris and Senatobia and remand the cause for further proceedings not inconsistent herewith.

REVERSED and REMANDED.