# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 05-1144

KEMPER/PRIME INDUSTRIAL PARTNERS,

*Plaintiff-Appellant,*

*v.*

MONTGOMERY WATSON AMERICAS, INC.,

*Defendant-Appellee,*

*v.*

THE PRIME GROUP, INC.,

*Third-Party Defendant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 97 C 4278—**Ronald A. Guzman**, *Judge.*

ARGUED NOVEMBER 27, 2006—DECIDED JUNE 12, 2007
PUBLISHED JUNE 19, 2007

Before BAUER, WOOD, and EVANS, *Circuit Judges.*

WOOD, *Circuit Judge.* This case concerns who is responsible for certain environmental clean-up costs. Kemper/Prime Industrial Partners ("Kemper/Prime"), the plaintiff, claims that an environmental assessment of a parcel of land performed by Warzyn, Inc., the predecessor of defendant Montgomery Watson Americas, Inc. ("Montgomery"), was deficient insofar as it failed to reveal to Kemper/Prime

the full extent of contamination and clean-up costs. The property in question was called the Chicago Enterprise Center ("the Property"), which Kemper/Prime purchased after receiving Warzyn's report in 1990. Later, when it decided to refinance the Property in 1996, Kemper/Prime conducted another environmental assessment of the land. The new assessor discovered contamination that was present in 1990 but that Warzyn had not detected. Kemper/Prime sued Montgomery, Warzyn's successor, claiming negligent misrepresentation on Warzyn's part, but the district court ruled that its evidence of damages was insufficient and dismissed the case with prejudice. We affirm.

**I**

In February 1990, an entity called the Prime Group, not to be confused with plaintiff Kemper/Prime, hired Warzyn to conduct an environmental assessment of the Property, a 120-acre stretch of industrial land in south Chicago, to determine whether the Property had unknown environmental hazards or problems. Warzyn understood that the Property would soon be bought by a new partnership to be known as Kemper/Prime, which was created to make that purchase by partners in the Prime Group. As planned, Kemper/Prime purchased the Property after Warzyn issued its final reports in June of 1990.

As part of its assessment, Warzyn conducted a four-month evaluation of the Property, including a site visit, an historical records search, a review of previous reports about the Property, an investigation of information from state and federal sources relevant to the Property, soil testing, soil boring, installation of monitoring wells, analyses of decontamination procedures, water level measurements, ground water sampling, PCB wipe sampling procedures and other field testing. Warzyn concluded

that there were still unreviewed areas in the Property, but based on the scope of the work that the Prime Group had commissioned, it did not investigate these additional areas.

Warzyn published two reports for the Prime Group in June of 1990. The reports identified some contamination, focusing in particular on two sections of land (identified as SB17 and SB8) within the Property that were part of a "major area of concern" south of Building S. The Prime Group had expected Warzyn to retrieve Sanborn Fire Maps for the Property, but Warzyn reported that such maps were unavailable. At some point after Warzyn's assessment, the parties learned that this was incorrect, and that Sanborn Maps were available for the years 1897, 1913, 1947, 1950, 1976, and 1987. The Sanborn Maps for 1947 and 1950 showed 26 underground storage tanks on the Property. The later two Sanborn Maps showed none of these tanks.

After issuing its reports, Warzyn sent a short letter to the Prime Group noting that Warzyn had "developed a proposal to quantify the extent of contamination identified." Neither the reports nor the letter stated that Warzyn had taken the next step and quantified the full environmental remediation costs for the Property. Instead, the reports and the letter identify some costs for cleaning up some of the identified contamination. In context, it appears that the costs may relate to the "major area of concern" near Building S, because the cost discussion follows immediately after the discussion of the Building S area. That area is not a part of the Property at issue in this litigation.

Between 1993 and 1996, two other environmental assessments were done on the Property—one by Dunn Corporation in 1993 and one by Carlson Environmental, Inc., in 1996. Also during this time, Kemper/Prime subdi-

vided and sold significant sections of the Property. Taken together, these sales yielded millions of dollars in profits for Kemper/Prime.

Kemper/Prime was nevertheless displeased to learn that the Property had more environmental contamination than it had been led to believe before its initial purchase. In 1997, Kemper/Prime sued Montgomery. Then in 1999, several of the entities that had purchased sections of the Property joined the suit as plaintiffs. Also in 1999, Montgomery filed a third-party claim against the Prime Group pursuant to an indemnification provision in the 1990 agreement between the Prime Group and Warzyn. In 2003, the district court dismissed the claims brought by the 1999 plaintiffs. No claims have been filed between Kemper/Prime and the Prime Group. (This is important because a defendant's impleader under FED. R. CIV. P. 14 of a party that is not diverse from the plaintiff does not destroy jurisdiction. See 28 U.S.C. § 1367(b).)

Although Kemper/Prime filed its complaint against Montgomery in 1997, the litigation dragged on for several years. In 2003, Montgomery made two motions in limine about the standard of damages the district court should employ, questioning whether Kemper/Prime would be able to satisfy its burden of proof under the appropriate standard. The district court expressed "serious doubts about the ability of . . . Kemper/Prime . . . to provide evidence of damages." Kemper/Prime then filed a "Memorandum Of Evidence On Damages That It Will Present At Trial." After Montgomery filed a responsive brief, the district court concluded that "Plaintiff cannot offer proof of all necessary parameters of the damages calculation, and [therefore] Plaintiff is barred from presenting evidence of damages at trial" and dismissed the case with prejudice, in substance granting summary judgment in Montgomery's favor. Kemper/Prime appeals its dismissal to this court. We note that Montgomery's claim for indemnification

against the Prime Group is still pending in the district court, which would ordinarily mean that the judgment is not yet final in this case for purposes of 28 U.S.C. § 1291. Here, however, the court issued an order under FED. R. CIV. P. 54(b) certifying that all claims between Kemper/Prime and Montgomery were resolved and there was no just reason for delay for purposes of appeal. Our appellate jurisdiction is therefore secure.

## II

Because the district court's jurisdiction was based on diversity of citizenship, 28 U.S.C. § 1332(a), we look to state law (here, that of Illinois) for the rules of decision. See 28 U.S.C. § 1652; *McClain v. Owens-Corning Fiberglas Corp.*, 139 F.3d 1124, 1126 (7th Cir. 1998) (specifically addressing the question of whether evidence supports an award of damages). The Illinois Supreme Court allows suits alleging negligent misrepresentation "where [the defendant] is in the business of supplying information for the guidance of others in their business transactions." *Brogan v. Mitchell Int'l*, 692 N.E.2d 276, 278 (Ill. 1998); *Moorman Mfg. Co. v. National Tank Co.*, 435 N.E.2d 443, 452 (Ill. 1982). A plaintiff alleging negligent misrepresentation must prove (1) the defendant made "a false statement of material fact," (2) the defendant had the "intention to induce the other party to act," (3) the plaintiff relied "on the truth of the statements," (4) "damage to the other party resulting from such reliance," and (5) the "defendant owes a duty to the plaintiff to communicate accurate information." *Board of Educ. v. A, C & S, Inc.*, 546 N.E.2d 580, 591 (Ill. 1989). At issue in this appeal is the fourth element, "damage . . . resulting from such reliance."

The Illinois state courts have not adopted a particular approach to damages for negligent misrepresentation cases. Montgomery argued before the district court that

the proper measure of damages here is the diminution of value of the land at issue, while Kemper/Prime asked the district court to adopt the damages standard set forth in § 552B of the Second Restatement of Torts. The district court agreed with Kemper/Prime and looked to § 552B for its standard.

This court faced a similar lack of standards for damages in a diversity action in *Trytko v. Hubbell, Inc.*, 28 F.3d 715, 721-24 (7th Cir. 1994). In *Trytko*, the plaintiff brought a negligent misrepresentation action under Indiana law. *Id.* at 718. The *Trytko* court noted that "[a]lthough the [Indiana Supreme Court] adopted § 552 of the Restatement (describing the elements of the tort of negligent misrepresentation), no Indiana court has discussed or adopted § 552B's view of damages. Nevertheless, the Restatement, in its stature, seems an appropriate starting point for our discussion." *Id.* at 721-24. The *Trytko* court, consistently with many others, adopted § 552B and its commentary as the proper standard of damages, including that section's limitation of damages in negligent misrepresentation cases to reliance damages only, not expectancy damages. *Id.* at 724 (citing § 552B(2)). See also *Becker v. PaineWebber, Inc.*, 962 F.2d 524, 527 (5th Cir. 1992); *Cunha v. Ward Foods, Inc.*, 804 F.2d 1418, 1426 (9th Cir. 1986); *Battenfeld of Am. Holding Co. v. Baird, Kurtz & Dobson*, 60 F. Supp. 2d 1189, 1202 (E.D. Pa. 1999); *Rosales v. AT&T Information Systems, Inc.*, 702 F. Supp. 1489, 1501 (D. Colo. 1988); *First Interstate Bank of Gallup v. Foutz*, 764 P.2d 1307, 1310 (N.M. 1988); *Law Offices of L.J. Stockler v. Rose*, 436 N.W.2d 70, 85-86 (Mich. Ct. App. 1989).

We agree with the district court that if Illinois courts were to address the issue of standard of damages in a negligent misrepresentation action, they likely would adopt § 552B as their standard. Section 552B reads:

Damages for Negligent Misrepresentation

(1) The damages recoverable for a negligent misrepresentation are those necessary to compensate the plaintiff for the pecuniary loss to him of which the misrepresentation is a legal cause, including

(a) the difference between the value of what he has received in the transaction and its purchase price or other value given for it; and

(b) pecuniary loss suffered otherwise as a consequence of the plaintiff's reliance upon the misrepresentation.

(2) the damages recoverable for a negligent misrepresentation do not include the benefit of the plaintiff's contract with the defendant.

Relying on § 552B, the district court concluded that in order to prove damages, Kemper/Prime needed to "offer evidence of (1) the cost of remediating the contamination listed in the 1990 Report, and (2) the total cost of remediating the contamination that existed on the Property at the time of the 1990 Report." This evidence could satisfy either § 552B(1)(a) or (b) because it would either show the extent to which Kemper/Prime overpaid for the Property or the additional costs Kemper/Prime was forced to incur because of its reliance on Warzyn's reports. In fact, this interpretation of § 552B was generous to the plaintiff, as § 552B can be read more narrowly. Indeed, Montomgery contends that the district court's approach to pecuniary loss is "expansive." Because Kemper/Prime's evidence of damages does not satisfy even the district court's standard, however, we do not need to consider further whether Illinois would adopt a narrower reading of § 552B. Instead we move directly to the district court's conclusion that Kemper/Prime failed to raise a genuine issue of fact on allowable damages.

**III**

Illinois law requires that the plaintiff's "evidence shall with a fair degree of probability tend to establish a basis for the assessment of damages." *Schatz v. Abbott Laboratories, Inc.*, 281 N.E.2d 323, 326 (Ill. 1972). If it meets that standard (which we understand for purposes of a federal diversity case to mean evidence that, if believed by a trier of fact, would suffice to show damages), it need not be exact. Here, Kemper/Prime needed to proffer evidence of (1) the cost of remediating the contamination listed in the 1990 Report, and (2) the total cost of remediating the contamination that existed on the Property at the time of the 1990 Report.

**A**

In order to meet this burden, Kemper/Prime pointed to the 1990 Warzyn report, the testimony of an expert, Gary Vajda, the testimony of one of its officers, James Martell, the other Warzyn materials, a draft letter from Warzyn to Martell on May 31, 1990, and a few lines of handwritten notes following a conversation between Martell and Warzyn on June 1, 1990. We agree with the district court that this evidence does not "establish a basis for the assessment of damages" with any degree of probability, let alone "with a fair degree of probability." First, Kemper/Prime has identified no statement by Warzyn in the 1990 reports or in any supporting documentation from Warzyn produced at the time of the reports of the cost of remediation for the Property. Second, Kemper/Prime identifies nothing in the reports or other Warzyn documents from which a court could infer the cost of remediation. Third, even if Kemper/Prime could point to such a remediation cost, Kemper/Prime has not demonstrated how a court could infer from that data what the cost of remediating only the sections of the Property at

issue in this litigation would be or compare the cost of remedying the problems Warzyn found on the relevant parcel to the cost of full remediation in 1990, the second fact required by the district court.

Kemper/Prime contends that the affidavit by its expert Gary Vajda concerning the standard of care in environmental assessment reports is evidence of the cost of remediating the contamination identified by Warzyn in 1990. Vajda stated that it is "the standard practice of consultants performing this type of work to at least provide a qualitative but more often a quantitative evaluation of the potential liabilities . . . [and] *it was not unusual* to provide order of magnitude costs (or cost ranges) that bracket the potential liabilities." (emphasis added). This statement is far too vague, however, to support a claim that Kemper/Prime was entitled to view the Warzyn reports as a definitive statement of the costs of remediation, nor does it demonstrate an industry standard practice that requires cost estimates for all possible remediation.

Montgomery correctly states in its brief to this court that there is no evidence that Warzyn made any statement to Martell, Senior Vice President of the Prime Group and an officer of Kemper/Prime and the Prime Group, or anyone else, that the cost to remediate all the contamination on the Property in 1990 was $300,000. Although Kemper/Prime may have been technically correct when it told the district court that Warzyn "failed to quantify the contamination for locations where it found contamination," a lack of quantification is a far cry from a representation by Warzyn that there were no remediation costs. Kemper/Prime's Evidence Memo to the district court stated that it "relied on [Warzyn] to determine the potential environmental concerns or liability at the Property," not the costs of remediating the Property. The short letter from Warzyn drafted on May 31, 1990, states that Warzyn

"developed a proposal to quantify the extent of contamination identified," but again it does not state that Warzyn quantified any of the remediation costs or that it was expected to do so.

Even if Kemper/Prime had expected a full remediation cost estimate, it could not reasonably have viewed the $300,000 figure it references to be such an estimate. The notes from the phone call and the short draft letter from Warzyn, on which Kemper/Prime relies, refer specifically to just two sections of land (labeled SB17 and SB8) within the Property. These two sections of land were part of a larger section that Warzyn labeled a "major area of concern" south of Building S. We have doubts that this letter, with the word "DRAFT" stamped in large print on every page, could be considered relevant evidence of guaranteed remediation costs. At best, the $300,000 is part of the remediation costs implied by the contamination identified in the reports. Yet not only were the costs for remediating the rest of this problem area not discussed, but this portion of the Property is not at issue in this litigation.

Warzyn's comprehensive reports were issued in June 1990, just days after the draft letter was written. Taking just one example, one of the reports notes the presence of chromium at MW4 (a monitoring well used for the report). MW4 appears to be within the area of the Property at issue in this case. After noting the MW4 chromium, among other findings, the report states "[a]dditional sampling would be required to determine the extent of soil contamination, the presence of additional inorganics, and the migratory nature of compounds found." This is one of many statements to Kemper/Prime underscoring the limited scope of Warzyn's work. Kemper/Prime's contention, then, that the "Defendant left Martell with the impression that except for the remedial estimate provided to Martell, there were *no* other remedial costs" has no basis in the evidence that was proffered.

Kemper/Prime could have used its expert to analyze the Warzyn reports, take note of every measurable amount of contamination identified, and calculate remediation costs based on some industry standard cost, but it did not do so. Without such additional materials, the district court was left with no means of identifying or inferring the cost of remediation from the Warzyn reports.

Finally, we are left with two insurmountable calculation problems. Kemper/Prime has sold significant sections of the Property since 1990; indeed, in post-argument submissions the parties discussed the effect of Kemper/Prime's sale of its remaining holdings in October 2004. Any remediation costs identified in the Warzyn reports would need to be reduced by the costs associated with the sections of the Property no longer owned by Kemper/Prime. This has not been done. Second, there is no evidence that even the $300,000 figure, nor any other figure, is what is called a Tier One remediation cost, or that it was calibrated to any particular standard of remediation. There are many such standards for cleaning up contaminated land, depending on what the planned use of the land is. As the district court noted, in order to come up with a valid comparison of the cost of remediating the problems that were identified with the cost of remediating all problems that existed, both must be calibrated to the same standard. Kemper/Prime offers only Tier One evidence of the full cost of remediating the contamination that existed in 1990. A court given these two cost estimates would be left to compare them not knowing if it was making an apples-to-apples comparison or an apples-to-oranges comparison. That level of uncertainty is insufficient to "establish a basis for the assessment of damages" with any "degree of probability."

Therefore, we are led to the same conclusion as the district court: Kemper/Prime has not shown a genuine

issue of material fact for the remediation costs for the contamination listed in the 1990 Warzyn reports.

## B

Kemper/Prime's evidence of the total cost of remediating all of the contamination that existed on the Property at the time of the 1990 reports is equally flawed. Again, Kemper/Prime's cost estimates do not make any adjustments for the sections of the Property it no longer owns. Moreover, Kemper/Prime's cost estimates are calculated only for the Tier One standard. Beyond the comparison problems to which these gaps give rise, it appears from the record that the Tier One standard is not normally used to remediate industrial properties. There is nothing in the record to suggest that Kemper/Prime or any subsequent owner of the Property wants to use it for non-industrial use. Therefore, even if the estimates were tailored to the correct sections of the Property, they would still be unusable in this case. This evidence too therefore fails to raise a triable fact issue.

## IV

Montgomery also urges this court to accept an alternative basis for affirming the district court's opinion. Montgomery contends that the district court's interpretation of pecuniary loss is too "expansive" because it includes benefit-of-the-bargain damages, which are not available in negligent misrepresentation actions. See Restatement (Second) of Torts § 552B(2), Comment b ("[T]here is as a general rule no liability for merely negligent conduct that interferes with or frustrates a contract interest or an expectancy of pecuniary advantage.") Although we see the logic of Montgomery's argument, there is no need to address its merits. Kemper/Prime's evidence of damages

falls short under the more generous standard set forth by the district court, and so it would inevitably fail under the stricter standard Montgomery prefers. We cannot help but note, however, that yet another Kemper/Prime entity, the Prime Group Partners, has agreed to remediate all the contamination and indemnify Kemper/Prime against environmental liabilities at the Property. It also appears that since this lawsuit began, Kemper/Prime has sold its remaining interests in the Property for a profit. We are left with a plaintiff that appears to have benefitted significantly from the purchase of the Property, with no sign of any pecuniary loss.

## V

The district court gave Kemper/Prime every opportunity to put forth evidence of its recoverable damages, but it failed at every turn. We therefore AFFIRM the decision of the district court.

A true Copy:

      Teste:

 

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*